# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 23, 2014 Session

## KATHRYN A. DUKE v. HAROLD W. DUKE, III

**Appeal from the Chancery Court for Williamson County**
**No. 33519      James G. Martin, III, Chancellor**

_____

**No. M2013-00624-COA-R3-CV - Filed October 3, 2014**
_____

This case involves the modification of a parenting plan. The trial court reduced Father's time with the parties' children to four hours of supervised time every other weekend. The trial court so limited the Father's parenting time as a result of his intentional interference with the children's relationship with Mother. Father appeals the trial court's modification of the parenting schedule. In addition, he claims the trial court erred by: (1) limiting Father's communication with the children; (2) refusing Father's request to retain an expert to rebut testimony by an expert Mother and Father initially agreed would provide a recommendation about parenting time; (3) excluding certain portions of his treating physician's testimony; (4) requiring the children to continue counseling sessions with a psychologist; (5) terminating Father's participation in educational decisions for the children; (6) instituting a permanent injunction against Father; (7) finding Father guilty of six counts of criminal contempt; (8) finding Father in civil contempt; (9) denying Father's requests to reopen the proof to present newly discovered evidence; and (10) awarding Mother $678,933.05 in attorneys' fees and discretionary costs. We reverse the judgment of the trial court finding Father in civil contempt. We affirm the judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part and Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS J., joined.

James L. Weatherly and Jacqueline B. Dixon, Nashville, Tennessee, for the appellant, Harold W. Duke, III.

Helen Sfikas Rogers, Nashville, Tennessee, for the appellee, Kathryn A. Duke.

## OPINION

### I. BACKGROUND

This is a post-divorce case involving issues of child visitation, parent alienation, civil contempt, criminal contempt, evidence, and attorneys' fees. Kathryn A. Duke ("Mother") and Harold W. Duke, III ("Father") are the parents of three children who were born in 1995, 1997, and 2000. The Chancery Court for Williamson Country granted the parties a divorce in July 2009, naming Mother the primary residential parent. Mother was awarded 285 days with the children, and Father was awarded 80 days.[1]

Three months after the parties were divorced, Mother filed a motion for civil contempt based on Father's alleged failure to pay court-ordered support and expenses. Mother subsequently filed a petition in January 2010 seeking an order holding Father in civil and/or criminal contempt of the court's prior orders due to statements made by Father to the children about the parties' divorce and derogatory comments made by Father to the children about Mother. Mother also requested that the trial court severely limit or modify Father's time with the children.

The trial court entered a restraining order against Father on January 13, 2010, in which Father was enjoined and restrained from: (1) discussing the parties' divorce or post-divorce litigation with the children; (2) approaching Mother's vehicle or exiting his house during exchanges of the children at Father's residence; (3) exiting his car during exchanges at Mother's residence; and (4) communicating with Mother other than through their attorneys.

Father filed a motion to vacate the restraining order on January 20, 2010.[2] The trial court modified the restraining order to permit Father to communicate with Mother by e-mail, stating "such communication shall be factual concerning logistics or compliance under the Parenting Plan or other such issues that the parents must address, and it shall contain no commentary by either party outside of the factual information that needs to be exchanged." In all other respects, the court directed that the restraining order would remain in effect.

---

[1] *Duke v. Duke*, No. M2009-02401-COA-R3-CV, 2012 WL 1971144, at *2 (Tenn. Ct. App. June 1, 2012).

[2] Father also moved for the trial judge to recuse himself. This request was denied. *See Duke v. Duke*, 398 S.W.3d 665, 667 (Tenn. Ct. App. 2012).

2

On April 13, 2010, Father filed a petition seeking a restraining order against Mother and permanent change of custody with respect to the oldest child, Wesley.[3] Father's request for a restraining order was based on what Father perceived to be Mother's inappropriate interactions with, and discipline of, Wesley. Father also asked that Mother be restrained from approaching Father in an attempt to engage him in conversation because Father was restrained from communicating with Mother face-to-face. The trial court entered a restraining order against Mother on April 14, 2010, enjoining and restraining her from: (1) driving a vehicle while any of the children are clinging to the outside of the vehicle; (2) grabbing her son in an inappropriate way; (3) approaching Father to converse while Father is prohibited from conversing with Mother; and (4) discussing the contents of Father's petition with the children.

The parties filed additional related motions and petitions over the next few months. In addition, Father sought permission to interview the children. Father claimed the children may be necessary witnesses in the case because statements were allegedly made to the children in violation of a restraining order. The trial court entered an order on August 26, 2010, addressing three motions by Father and eight motions by Mother. The court granted Father's motion to interview the children. The restrictions on the parties' communication via e-mail remained in place. The court also denied Father's emergency request for a change of custody with respect to Wesley.

Following the trial court's August 26, 2010 Order, the parties continued to file motions and amended petitions alleging contempt of the court's orders by the other parent and requesting additional restraining orders. Father also made further requests for custody of Wesley. In October 2010, Father filed an Amended Petition in which he sought equal physical custody and/or equal parenting time with the parties' daughters, Emily and Caroline.

## A. March 15, 2011 Hearing and Agreed Parenting Evaluation

On March 8, 2011, Father filed a motion seeking permission for the children to be interviewed by a potential Rule 26 expert regarding issues related to the children's best interests and Father's parenting of the children.[4] Mother opposed this motion, and the court held a hearing on this and other issues on March 15, 2011.

---

[3] Wesley reached the age of majority in 2013. As a result, his custody is no longer an issue in this case.

[4] Father filed this motion following Mother's fourth amended petition, in which Mother alleged parental alienation and sought to eliminate Father's parenting time altogether. In the alternative, Mother requested that the court severely limit Father's parenting time and require Father's parenting time to be supervised.

3

At the hearing on March 15, Mother's attorney explained that, during the parties' divorce proceedings in 2009, Dr. William Bernet[5] and another doctor tested the children, interviewed the parents, conducted full psychiatric tests on the parents, and recommended a parenting plan. Mother's counsel informed the court that both Father's and Mother's attorneys approached Dr. Bernet "to weigh back in on this" due to Mother's allegation of parental alienation. Mother's attorney explained that Dr. Jay Woodman and Dr. Bernet met on the Friday before the March 15 hearing and decided that it might be best for Dr. Bernet to interview Mother and Father again to "get all the information he might need on the children to raise [sic] whatever conclusions he needs to make that would be helpful to the court."

Mother's attorney continued:

Dr. Woodman and Dr. Bernet, at least initially, thought these children do not need to be interviewed. They have been through horrible stuff. They have been bounced back and forth between these parents. Dr. Woodman is doing everything he can. He is seeing these children almost weekly, and what Dr. Woodman was told by [Father's attorney] is that they are thinking about taking the children to see Dr. Hunt, who is Dr. Duke's treating psychiatrist. I would guess that the purpose of that would be for Dr. Hunt to say your dad really does have [attention deficit disorder ("ADD")] and he really does need to take Adderall. Even at trial, Dr. Murray Smith, Dr. Scott Ruder, and Dr. Bernet all testified that they didn't think that was the case.

And so where do we start? Once we start down this slippery sliding slope of let[ting] the children [be] interviewed . . . by their Rule 26 [expert], then do I have the opportunity to have my own Rule 26 person look at them? If so, then why have we been bothering Dr. Bernet? . . . Dr. Bernet has the history. He saw these kids four years ago, basically. He could compare what he saw when they were going through the divorce versus what's going on now.

After hearing argument from both sides, the court denied Father's motion to have the children interviewed by a Rule 26 expert. The trial court explained:

---

[5] During the divorce proceedings, Mother and Father relied on the psychiatrist Dr. William Bernet and the psychotherapist Dr. Jay Woodman to assist them in developing a parenting plan. As part of the permanent parenting plan, the court required the children to have counseling sessions with Dr. Woodman "with such frequency and duration of counseling as determined in collaboration with Dr. Woodman."

4

I met with the children, as you-all know, and talked to them, and at this time I'm not inclined to go any further with these children than they have already gone with Dr. Woodman.

I'll reserve the issue, though, and if at the trial of this case I think somebody else is needed, I will revisit the question, but I'm not going - - I'm not going any further with additional expert evaluation of these children between now and the trial.

On April 6, 2011, Mother and Father proposed an Agreed Order for Evaluation and Recommendation, which the trial court adopted and entered as an order. Pursuant to the terms of the Agreed Order, Dr. Bernet was to meet individually with Mother and Father to update the parenting evaluations he conducted in September and October 2007. Dr. Bernet was ordered not to interview the children, but he was permitted to collect additional information about the children from Dr. Woodman. Dr. Bernet was directed to prepare a report including recommendations regarding: (1) the children's parenting arrangements; and (2) psychotherapy and other psychosocial interventions for the family members. Once his report was completed, Dr. Bernet was instructed to distribute it simultaneously to counsel for both parties. The Agreed Order continued, "in the spirit of being neutral and impartial, Dr. Bernet and Dr. Woodman prefer to meet with or have telephone conference calls with both attorneys at the same time, so that everybody hears the same information concerning the evaluation . . . ."

## B.  Dr. Bernet's May 12, 2011 Report

Dr. Bernet prepared a report entitled "Forensic Parenting Time Evaluation," which was introduced as an exhibit during the trial of this case. In preparing the report, Dr. Bernet met with Father for 5.2 hours over two days, and he met with Mother for 4 hours over two days. Dr. Bernet also had telephone conversations with Father's treating physicians; the children's counselor; Dr. Woodman; and the parties' attorneys.

Dr. Bernet stated the following in his report:

I am concerned that from 2008 to the present time, the children have been caught in the middle of an intense battle between their parents. All three children have gravitated to form a strong alliance with their father and they tend to reject and avoid a satisfying relationship with their mother . . . .

It is very painful for children to find themselves in situations over and over in which they feel they have to reject the love and nurture of one of their

5

parents . . . . In general, Dr. Duke blamed the children's attitudes and behaviors on things Ms. Duke has done; on the other hand, Ms. Duke blamed the problem on things Dr. Duke has done. My overall conclusion is that both parents have contributed to the current situation, in which the children have criticized Ms. Duke, opposed her, and rejected her far out of proportion to anything Ms. Duke has done. However, I believe that the children's father, Dr. Duke, has been by far the greater cause of the children's rejection of their mother. I believe that Dr. Duke has persistently, actively, and purposefully undermined and sabotaged the children's relationship with their mother.

. . . .

With regard to their mother, Dr. Duke has apparently instructed the children not to actively argue or fight with her, but to simply avoid engaging in activities or conversation with her . . . . Dr. Duke told me, "The children's anger is generally passive. I've told the kids that they have the right to not do things, such as not go to a ball game. They refuse to go to events." . . .

The children have identified with Dr. Duke's anger at Ms. Duke and have expressed it directly and indirectly to her. According to Ms. Duke, Wes said he hated her and, "When I graduate from high school, I'll never see you again." Generally, however, the children have behaved toward their mother exactly the way Dr. Duke instructed them to behave, *i.e.*, refusing to participate in activities with her. Ms. Duke said, "It's like the children have made a pact that there will be no fun, no good memories at their mother's home." . . .

I conclude that Dr. Duke has actively encouraged the children to disregard and shun their mother . . . .

Dr. Duke related to me many criticisms of Ms. Duke, and he has apparently discussed those same criticisms with Wesley, Caroline, and Emily. In doing so, Dr. Duke has persistently undermined Ms. Duke's relationship with her children.

. . . Ms. Duke related that the children persistently criticized her, no matter what she did. She said, "I don't have the right to do anything in my home. If I laugh, they say I'm faking it. If I cry, it's because I want pity . . . ."

. . . .

6

Some of Dr. Duke's criticisms of Ms. Duke seem rather farfetched and they seemed to reflect an overly suspicious outlook, especially in terms of his relationship with Ms. Duke.  In some instances, the children adopted Dr. Duke's suspicions and stated them either with Ms. Duke or with Dr. Woodman.  Those were further instances of Dr. Duke's undermining the children's relationship with their mother.

For example, Dr. Duke thought that Ms. Duke was responsible in some way for the death of the dog of Ms. Lineberger, his fiancée.  Dr. Duke said, "I think she was involved with Ms. Lineberger's dog, I do.  I should not have made the comment to the children about it.  The dog was put in the back seat of the Suburban on a sunny day.  My belief, personally, is that Ms. Duke was involved with it."  The children heard and adopted Dr. Duke's overly suspicious interpretation of those events.  According to Ms. Duke, they said, "You killed Jennifer's dog," and, "I can't believe you killed Jennifer's dog." The children told Ms. Duke that Dr. Duke said she had done that.

. . . .

Ms. Duke agreed that she was not perfect.  She agreed that there were times when she said or did something that she later regretted.  She related a particular time that she became irritated with Wesley and said the wrong thing.  Ms. Duke related that on November 11, 2009, she and the children were celebrating Wesley's birthday.  Ms. Duke said, "I wanted to take a photograph of Wes and the cake.  Wes said, 'You're going to use that picture against Dad in court.  You're the reason he's not here.'  He went up and slammed the door.  I was frustrated.  I said, 'I'm not responsible for the parenting plan.  The addiction and the adultery did not favor your Dad.  It was his choice to abandon us.'  I should not have used the word 'abandon.'  I felt he abandoned me.  He moved on to another woman.  Later, I apologized to the children.  I said, 'My feeling is he abandoned me, but he did not abandon you.'"

Dr. Bernet next addressed the phenomenon known as "parental alienation":

The phenomenon of parental alienation is not new; it has been described in the legal literature at least since the 1820s . . . .  The children in this family clearly meet the following criteria for this serious mental condition:

7

- *The children have allied themselves strongly with Dr. Duke and have rejected a relationship with Ms. Duke without legitimate justification.* In this case, the children's rejection of Ms. Duke is far out of proportion to anything she has done.

- *A persistent rejection or denigration of a parent that reaches the level of a campaign.* According to all my sources of information -- Dr. Duke, Ms. Duke, and Dr. Woodman -- the children persistently criticize their mother and oppose her parenting activities.

- *Weak, frivolous, and absurd rationalizations for the child's persistent criticism of the rejected parent.* According to Ms. Duke, the children criticize her behaviors, no matter what she does, *e.g.*, whether she laughs, cries, or tries to help them.

- *Lack of ambivalence.* The children have almost completely positive opinions about Dr. Duke and negative opinions about Ms. Duke.

- *Independent-thinker phenomenon.* I have not heard this type of thinking from the children themselves, but Dr. Duke insists that it is the children who have perceived Ms. Duke's faults, and he is simply validating their observations.

- *Reflexive support of one parent against the other.* The children appear to agree with Dr. Duke in almost every situation, without considering the pros and cons.

- *Absence of guilt over exploitation of the rejected parent.* The children, especially Wesley, do not seem to be bothered by their rude and negativistic behaviors toward Ms. Duke.

- *Presence of borrowed scenarios.* This report relates to many instances in which the children simply restated Dr. Duke's attitudes and opinions about Ms. Duke.

- *Spread of the animosity to the extended family member of the rejected parent.* The children recently shunned their maternal grandmother, whose company they previously enjoyed.

8

This assessment is important because it helps us understand the children's strong alliance with their father and their rejection of their mother, although previously they had an enjoyable, mutually satisfying relationship with her.

In reaching a recommendation for the parenting schedule, Dr. Bernet explained:

In the absence of parental alienation, I would give considerable attention to the children's preferences. However, if the children's strong opinions are simply the result of parental alienation -- driven by the father's active indoctrination of the children against their mother -- I do not take the children's preferences literally.

Many of the mental health professionals who have studied and written about this topic concluded that parental alienation is a form of psychological abuse of the child victims, which is why this pattern of behavior needs to be identified and addressed. If the children's adamant statements to seek more time with their father are caused by his toxic influence on them, one would conclude that Dr. Duke's time with the children should be reduced, not increased.

Dr. Bernet's ultimate recommendations included the following:

1. If Dr. Duke makes a firm commitment to change his negative attitude toward Ms. Duke and his pattern of indoctrinating the children against her, I recommend a comprehensive treatment program with the goal of helping the children achieve healthy, mutually satisfying relationships with both parents.

As part of this plan, Dr. Bernet recommended that Dr. Duke cease taking Vyvanse for ADD because of its possible contribution toward Dr. Duke's overly suspicious attitude toward Ms. Duke. Dr. Bernet also recommended that Dr. Duke attend 12-step AA meetings. However, Dr. Bernet stated the following:

I am not optimistic that Dr. Duke will accept the challenge of this recommendation. In the meetings with me, it was clear that Dr. Duke blamed almost all the children's issues on Ms. Duke. He has testified that he has not purposefully alienated the children from Ms. Duke. Dr. Duke told me that after his experience with [one parenting coordinator], he would never agree to

having another parenting coordinator.  Dr. Duke told me he had no interest in attending AA meetings.

Dr. Bernet also proposed an alternative course of action:

2.   If Dr. Duke is unable or unwilling to make a firm commitment to change his negative attitude toward Ms. Duke and his pattern of indoctrinating the children against her, I recommend that the children's parenting time with their father be very limited and supervised.

After conducting this evaluation, I conclude that Dr. Duke has been determined to win the children to his side of this high-conflict divorce by repeatedly finding ways to make his household seem nurturing, fun, and safe, while making Ms. Duke's household seem neglectful, boring, and dangerous. I predict he will continue to engage in the same campaign at every opportunity. With that in mind, I believe the children should be protected from his toxic influence.

Under Plan Two, Ms. Duke will continue as the primary residential parent for all three children.  I recommend that Dr. Duke's parenting time be greatly reduced in duration -- perhaps 4 hours every two weeks -- and that it be supervised.  If it becomes clear that Dr. Duke continues to undermine the children's relationship with their mother even during supervised parenting time, I recommend that his parenting time be suspended.

Under Plan Two, there is no expectation that Dr. Duke will change his attitudes and his behaviors.  There is no requirement that he have therapy of any type or participate in AA.  There is no requirement that he discontinue taking Vyvanse.  Under Plan Two, there is no parenting coordinator.  Under Plan Two, Dr. Woodman's therapy with the children would focus on helping them learn and understand what happened in their family and adjust to the loss of their relationship with their father.

In addition to the above, Dr. Bernet recommended that Mother have sole responsibility to make decisions with regard to health care, education, extracurricular activities, and religion.  Dr. Bernet also recommended that Father have no contact with the children at any time other than during his prescribed parenting time.   In other words, Dr. Bernet recommended there be no contact between the children and Father by mail, e-mail, texting, telephone, or through intermediaries.

10

## II. TRIAL PROCEEDINGS

The trial of this case began on May 25, 2011, and was suspended during the third day by agreement of both parties for 120 days. The intended purpose of the suspension was for the family to engage in counseling with Dr. Woodman two to three times per week. Father agreed to have no communication with the children during this time, other than during counseling sessions in which he participated or during his supervised parenting periods, which periods were to be determined by Dr. Woodman.

Toward the end of the 120-day pause in the trial and afterwards, the parties filed additional motions and responses regarding Father's parenting time and related issues. The trial continued in November 2011 for five days and finally concluded in March 2012. Then, in June 2012, Father filed a motion to reopen the proof in the case. The basis for this motion was to introduce a document entitled "Policy Statement on Office-Based Treatment of Opioid Addiction" and to permit additional testimony from Dr. Duke's treating psychiatrist, Dr. Robert Hunt, and his treating psychologist, Dr. Pete Harris. Father also renewed his earlier motion to retain his own expert to interview the children. This request was based on Father's contention that Dr. Bernet's testimony was biased and should therefore be stricken.

The trial court denied Father's motion to reopen proof. The trial court explained that during the parties' divorce in 2009, Father was found to be an addict. Therefore, the trial court concluded, the finding that Father was an addict is now "the law of the case."[6] Regarding this issue, the trial court ruled:

> At the trial of these post-divorce proceedings, Dr. Duke acknowledged to this Court that he is chemically dependent on Vyvanse. Accordingly, the March 27, 2012 Policy Statement of the Tennessee Board of Medical Examiners on Office Based Treatment of Opioid Addictions does not constitute a sufficient basis to reopen the proof in this case.

Addressing Father's argument that Dr. Bernet's testimony was biased, the court wrote:

> Dr. Duke's analysis of Ms. Duke's attorneys' time records to show the extent of contact between Dr. William Bernet and Ms. Duke's attorney, without more, is insufficient to support a conclusion that Dr. William Bernet was biased, that his testimony should be stricken, or that Dr. Duke should be allowed to employ an independent expert to interview the children and reopen

---

[6] The trial court noted that Father was taking Adderall during his divorce proceedings in 2009 and was taking Vyvanse, a form of Adderall, during the post-divorce proceedings.

11

the proof to hear testimony from such expert. Dr. Duke was given full opportunity, prior to and during trial, to inquire of Dr. Bernet as to the nature and extent of all contact that Dr. Bernet had with Ms. Duke and/or her attorney. There has been no showing, whatsoever, that Dr. William Bernet failed to make himself available to Dr. Duke and/or his counsel to the same extent that he was available to Ms. Duke and/or her counsel. Further, the parties agreed, as evidenced by an Agreed Order entered on April 6, 2011, that Dr. Bernet would update parenting evaluations he conducted in September and October 2007, prior to the trial of these post-divorce proceedings. There is absolutely no indication that Dr. Bernet withheld any information from Dr. Duke and/or his counsel, which would invalidate Dr. Duke's agreement to engage Dr. Bernet's services for the purpose of these post-divorce proceedings. "Extensive communication" between counsel for Ms. Duke and Dr. Bernet, without more, is an insufficient basis for the Court to reopen the proof in this case.

### A. Trial Court's Memorandum and Order dated November 15, 2012

### 1. Findings of Fact

The trial court entered a Memorandum and Order on November 15, 2012. The court made the following findings of fact concerning Father's post-divorce conduct:

1. Shortly after the Court's decision regarding the Permanent Parenting Plan Order was filed on June 29, 2009, Dr. Duke began telling the children that they were, in part, to blame for the limited amount of time that he had with them . . . .

2. On July 2, 2009, after Ms. Duke communicated with Dr. Duke by email concerning Caroline and Emily's summer camp schedules and transportation arrangements, Dr. Duke responded concerning camps which were scheduled for the following week as follows:

My time with the children is precious. They will hate you some day for what you have done these last two years. Time will prove out all . . . . Regardless of what all the experts say, the children are aware of what you have been doing.

. . . .

12

5. On July 10, 2009, Dr. Duke sent an email to Ms. Duke on the subject of "winning" and stated: "That valedictorian medal hanging in your office comes from cheating. All these years later you still cannot bring yourself to return it to its rightful owner. Some things never change. The children know. Rock bottom on. Helen cares."

6. In the fall of 2009, Ms. Duke was of the opinion that Dr. Duke was not making payments to her which were due pursuant to the Orders of the Court. She went to her church and borrowed $300. Dr. Duke obtained a copy of Ms. Duke's bank account records for this same period. In reviewing those records, Dr. Duke determined that Ms. Duke had made a purchase at a liquor store the same day that she had borrowed money from her church and shared this information with one or more of the children.

. . . .

10. [Following the parties' divorce], Dr. Duke . . . believed it was more important to "know the truth" than to have a good relationship with Ms. Duke. He further empowered the children by advising them not to argue or fight with Ms. Duke, but to avoid engaging in activities or conversations with her. As a result, the children's behavior toward their mother, on occasion, became passive. Dr. Duke told the children that they had the right not to go to ball games or attend events or go on trips with their mother when they did not want to do so. The children began to shun their mother, refuse to speak to her, would lock themselves in their room, and became generally disrespectful of her.

11. Dr. Duke and the children began to express the same observations and opinions regarding Ms. Duke.

(a) They agreed that Ms. Duke lied at the custody trial in order to get more parenting time.

. . . .

(c) Dr. Duke and the children found it inconsistent that Ms. Duke would express concern over Dr. Duke's alleged addiction, but at the same time allow him to drive a vehicle when the children were present as passengers.

(d) Dr. Duke accused Ms. Duke of killing Ms. Lineberger's dog or causing it to be killed, and the children accepted Dr. Duke's accusation as being true. Apparently Ms. Lineberger's dog died as a result of being left in an enclosed automobile during hot weather. Even after Dr. Duke apologized to the children for making this accusation, he maintained the opinion that Ms. Duke was responsible for the death of his girlfriend's dog even though he had absolutely no factual basis to support his opinion.

(e) Dr. Duke and the children asserted that he was more capable than Ms. Duke in assisting them with homework; that he was more capable of explaining things; if it were not for him, their grades would suffer; and that Ms. Duke was simply not smart enough to assist them.

(f) Dr. Duke and the children began to assert that Ms. Duke was sick, that she was dangerous, and that she was only nice to the children for the sake of court proceedings.

None of these beliefs or accusations had a factual basis. As a result, the children became hostile and upset toward Ms. Duke. They criticized her for virtually everything that she did. They criticized Ms. Duke over trivial matters. They criticized her for being a stay-at-home mother and not seeking employment outside the home, even though that had been her role throughout their entire lives.

. . . .

26. In January 2011, Dr. Duke accused Ms. Duke, in the presence of the children, of being dangerous, out of control and a threat to them. He encouraged the children to call 911.

27. Dr. Duke told the children that their mother could not be trusted because she tapped their phones and e-mails. There was no credible evidence at trial to support Dr. Duke's allegation.

28. When Ms. Duke would not agree to change the parenting schedule on occasion, Dr. Duke then put the children in the middle by telling them to ask for more time with him. . . .

29. After returning from Dr. Duke's home on Sunday evenings from visiting with him over the weekend, the children refused to make eye contact

with their mother and would not interact with their mother during the evening meal. Most often the children would eat and not tell their mother in advance that they had done so, with the result that she would prepare meals for the children that would go uneaten after they arrived home.

30. The children acknowledged that Dr. Duke talked with them about the divorce, communicated his negative opinions of Ms. Duke to them, and encouraged them to report to him regarding Ms. Duke's behavior.

. . . .

33. Even though he was aware of the children's misconduct when they were with Ms. Duke, Dr. Duke took no actions, whatsoever, to punish the children for such misbehavior or to even tell them that in his opinion such misbehavior was inappropriate. They experienced no consequences, whatsoever, from Dr. Duke as a result of their inappropriate behavior toward their mother.

. . . .

36. On May 27, 2011, the parties agreed to adjourn the trial proceedings for 120 days to enable the children to participate in intensive therapy with Dr. Woodman during which time Dr. Duke would not have extended contact with the children. The Order provides that Dr. Duke would have certain supervised parenting time with the children and would participate in the therapy sessions. At a session on July 14, 2011, because Dr. Duke was upset over statements that Ms. Duke had made in a former session, Dr. Duke refused to sit next to Ms. Duke at a table in Dr. Woodman's office as requested by Dr. Woodman, resulting in termination of the session. The children observed these behaviors by their father. Thereafter, Dr. Duke refused to participate in further family sessions, notwithstanding the provisions of the Court Order mandating that he do so, and he terminated supervised visitation with the children even though it was also mandated by the Court Order.

. . . .

38. Dr. Duke created an estrangement between the children and his sister with whom he had been previously close. He told the children that their aunt had testified against him in the divorce proceedings. The children's negative attitude toward extended family members included Ms. Duke's

15

mother. When she visited with the children in the spring of 2011, the children treated her so rudely and hurt her feelings to the point that she vowed not to return again.

. . . .

40. During a session with the agreed upon parenting coordinator, Dr. David McMillan, Dr. Duke contends that Ms. Duke threatened to kill the family dog. During the course of these post-divorce proceedings, Dr. McMillan testified concerning his interactions with Dr. and Ms. Duke during the time he was the parenting coordinator and the reasons for his resignation, which were fundamentally the result of Dr. Duke's behavior. Dr. McMillan was certain that at no time did Ms. Duke threaten to kill the family dog. When Dr. McMillan exited from the witness stand and passed by Dr. Duke's chair, Dr. Duke called him a liar, a comment which was not overheard by the Court. Dr. McMillan then confirmed to the Court in later testimony what Dr. Duke had said.

41. The Trial Court found as a result of evidence during the divorce proceedings that Dr. Duke is an addict. At that time, Dr. Duke was taking approximately twice the recommended dose of Adderall and he was taking Ativan, all of which had been prescribed for him. In 2004, Dr. Duke became addicted to opioid and benzodiazepine medications and went to residential treatment in 2005, leaving against medical advice. In 2006, he then obtained prescriptions for Adderall and Strattera which he now receives in the form of Vyvanse and Trazodone.

The evidence in these post-divorce proceedings established that there's been no change in these circumstances since the divorce. Dr. Duke now takes Vyvanse, a form of Adderall, at approximately twice the maximum dose recommended for adults, and he takes another psychotropic medication in order to sleep. Dr. Duke admits that he is chemically dependent, which, as established by the evidence, simply means that he cannot function without taking these drugs. Should he cease doing so he will experience withdrawal. Vyvanse is an amphetamine. Amphetamines have a high potential for drug abuse and should not be given to patients with a history of drug abuse. . . .

42. Dr. Duke sent written communications to Ms. Duke in direct violation of the Court's Order on at least four occasions, for which he has been found in criminal contempt of court. Dr. Duke's treating psychiatrist,

16

Dr. Robert Hunt, has prescribed Vyvanse and Strattera for Dr. Duke, as a result of his diagnosis that Dr. Duke has attention deficit disorder. Dr. Hunt was asked whether Dr. Duke's condition made it difficult for him to comply with the Court's Order. Dr. Hunt testified that he believes Dr. Duke is capable of complying with a clearly worded court order and simply elected not to do so.

43. After telling Ms. Duke in a written communication that she had cheated in order to obtain her valedictorian medal, [Dr. Duke] told one or more of the children that Ms. Duke did not earn [her] valedictorian medal and implied that Ms. Duke had cheated.

44. Dr. Duke has accused Ms. Duke of raging, a term which has now been adopted by the children in reference to their mother's behavior. However, the evidence does not establish that Ms. Duke's behavior with the children rises to the extreme level connoted by the term "raging."

The trial court noted that it had "very little confidence in the testimony offered by Dr. Duke during these post-divorce proceedings." The court explained:

[Dr. Duke] was often evasive in his responses to questions presented to him by counsel for Ms. Duke, and even to questions from his own attorney and the Court. He holds to his "truth" when there is no factual basis to support his "truth." He made statements, suggestions and innuendos to his children which caused them to draw conclusions which were unfounded . . . .

Further, Dr. Duke denied calling Dr. McMillan a liar as he passed by Dr. McMillan in the courtroom during the course of these proceedings. The Court finds that it was Dr. Duke who lied and not Dr. McMillan.

Turning to Mother's post-divorce behavior, the trial court made the following findings of fact:

1. In September 2009, Ms. Duke told the children that Dr. Duke had abandoned them, that he was a drug addict, and that he was having an affair with Ms. Lineberger. Ms. Duke subsequently apologized to the children for saying that he had abandoned them. Ms. Duke explained to the children that he had abandoned her, but not them . . . .

. . . .

6. Ms. Duke explained to Emily, in response to her questions about the Permanent Parenting Plan Order, that part of the reason for the Court's ruling on the Parenting Plan was Dr. Duke's abuse of narcotics and his stealing narcotics from Ms. Duke's mother, all of which was true.

The trial court found that Dr. Bernet and Dr. Woodman were credible witnesses. According to both Dr. Woodman and Dr. Bernet, Mother had contributed, in part, to the children's conduct and the problems in her home. However, both Dr. Bernet and Dr. Woodman testified that the overwhelming responsibility for the deterioration in the relationship between Mother and the children was the result of Father's misconduct.

Based on Dr. Bernet's and Dr. Woodman's testimony, the court found Dr. Duke had succeeded in virtually destroying Wesley's relationship with his mother. In addition, the court wrote:

It is questionable whether anything can be done to re-establish [Wesley and Mother's] relationship at this time. Dr. Duke has significantly damaged the relationship between Ms. Duke and the parties' daughters, Emily and Caroline. That relationship may be susceptible to repair. The psychological harm caused by Dr. Duke to his children is immeasurable. Unless the Court takes action to address that harm, the consequences to the children are potentially severe and long lasting.

. . . .

Both Dr. Bernet and Dr. Woodman bring impressive credentials to the Court. They each have many years of experience in their respective fields of psychiatry and psychology . . . . The court emphasizes that Dr. Bernet was selected by the parties to conduct the forensic parenting time evaluation which was performed during the period March 11 to May 12, 2011. This was a voluntary decision by the parties, with advice of counsel, and not a process imposed on the parties by the Court. Dr. Bernet had absolutely no reason to skew his findings and recommendations in favor of either party. His focus was to address the issue of the estrangement of the children from their mother and the reasons for that estrangement.

While Dr. Woodman was ordered by the Court to continue to serve as the children's counselor, Dr. Woodman was reluctant to offer an opinion concerning the root cause of the children's difficulties with their mother. It was only after being requested by the Court to do so that Dr. Woodman finally

addressed this issue and advised the Court that, in his opinion, the children's relationship with their mother has significantly deteriorated as a result of the father's conduct since the parties were divorced and that the children were and are suffering as a result of Dr. Duke's conduct.

According to Dr. Bernet, unless the Court can bring about some change in what is happening to the children, their relationship with Ms. Duke will continue to deteriorate and the children will become even more distanced and negative toward their mother because their conduct has taken on a life of its own and the children now believe, to some extent, that their criticisms of Ms. Duke are true.

## 2. Conclusions of Law

The trial court made the following conclusions of law:

The Court finds that there has been a material change of circumstances which has occurred since the entry of the Court's findings on June 29, 2009, which was not known nor reasonably anticipated at that time and which affects the children's well-being in a meaningful way. That change is solely and simply the deterioration in the relationship between Ms. Duke and the children brought about by Dr. Duke's misconduct.

Contrary to Dr. Duke's position, the change is not a result of the children's advanced age. By January 1, 2010, a little more than six months after entry of the Court's findings, the relationship between Ms. Duke and the parties' children had been significantly damaged. Life in Ms. Duke's household was chaotic, tumultuous, contentious, and unpleasant. The fact that the children were six months older by January 1, 2010, in no way explains that change. Since January 1, 2010, the relationship between Ms. Duke and the children has continued to deteriorate. There is no explanation for that continued deterioration other than the misconduct of Dr. Duke . . . . [W]hatever parenting skills Ms. Duke possessed prior to the entry of the findings on June 29, 2009, her ability to exercise those parenting skills was effectively negated as a result of Dr. Duke's misconduct.

. . . While the Court acknowledges that Ms. Duke has said and done things that she should not have said and done in the presence of the children, her conduct pales in significance to the magnitude of Dr. Duke's misconduct. Dr. Duke has been found guilty of six (6) counts of criminal contempt and

Ms. Duke has been found guilty of one (1). However, the conduct of Dr. Duke which does not rise to the level of criminal contempt but which has had a meaningful and deleterious effect on the well-being of the children completely overwhelms whatever wrongful conduct can be attributed to Ms. Duke.

. . . While the time the children desire to spend with their father has increased since the entry of the Court's findings on June 29, 2009, the Court finds that the children's desire in these regards is the result of influence of Dr. Duke and for no other reason.

In determining whether a modification of the residential parenting schedule was in the best interest of the children, the trial court explained that it was required to consider limiting factors set out by statute:

Tennessee Code Annotated section 36-6-406(d) directs the Court, under circumstances where a parent's involvement has an adverse effect on the children's best interest, to preclude or limit provisions of a parenting plan if the Court finds limiting factors to exist. The first limiting factor involves a parent's neglect or substantial non-performance of parenting responsibilities. . . . [The statutes] create an affirmative duty on the part of Dr. Duke and Ms. Duke to promote each other to their children and requires each parent to refrain from denigrating or criticizing the other parent to the children. The Court finds that Dr. Duke has violated his duties as a father to Wesley, Emily and Caroline based upon the facts proved at the trial of these post-divorce proceedings, and, as such, limiting factor (1) as found in Tennessee Code Annotated section 36-6-406(d) applies. Further, there is substantial proof that limiting factor (3) of the same subsection is applicable as a result of Dr. Duke's continued addiction to prescription medications. Certainly factor (5) in the foregoing section applies because Dr. Duke has clearly used conflict with Ms. Duke to create the danger of damage to the children's psychological development. In fact, the standard set forth in factor (5) goes to the very heart of these proceedings inasmuch as the evidence clearly establishes that the psychological development of all of the children has been damaged by virtue of Dr. Duke's misconduct.

As a result of its findings and conclusions, the trial court ordered the following relief:

[T]he Court is compelled to limit Dr. Duke's parenting time with the parties' children to four hours every other weekend on Saturday from 1:00

20

p.m. to 5:00 p.m. Dr. Duke's parenting time will be supervised by a person to be selected by Dr. Jay Woodman and shall be exercised at a place to be selected by Dr. Jay Woodman. Dr. Duke shall pay the cost of the supervision.

Further, Dr. Duke's parenting time shall be limited and supervised as provided herein until the relationship between Ms. Duke and each of the parties' children improves to the point where each child is no longer at risk of substantial harm as a result of Dr. Duke's conduct. It is not necessary that all of the children improve to this point before a particular child's residential parenting schedule with Dr. Duke, as set forth in the existing Permanent Parenting Plan Order, may be restored. If and when each child's relationship with Ms. Duke is restored to the point where such child is no longer at risk of substantial harm as a result of Dr. Duke's conduct, the Court will entertain a petition to restore that child's residential parenting time with Dr. Duke.

. . . .

As part of the limitation imposed by the terms of this Order, Dr. Duke shall have no contact with the children of any description except during his supervised parenting time and except during counseling sessions with Dr. Woodman. Should the children call Dr. Duke, email him, text him or otherwise attempt to communicate with him, Dr. Duke shall not respond. Dr. Duke shall not initiate any contact with the children of any description, either directly or through a third party. Dr. Duke shall not respond to contact initiated by the children with him through a third party.

The trial court next addressed the issue of the children's ongoing counseling sessions with Dr. Woodman and future decisions regarding the children's education. The court ordered that the counseling sessions continue. Although the parties shared joint decision-making about the children's education under the Permanent Parenting Plan Order entered in 2009, the trial court gave Mother sole authority to make decisions about the children's education going forward.

**B. Trial Court's January 14, 2013 Order**

Father filed a motion in December 2012 seeking to set aside the trial court's Memorandum and Order regarding his parenting time and to reconsider its order from March 2011 denying his request for a Rule 26 expert to interview the children. The trial court entered an order on January 14, 2013, in which it noted that, based on the pleadings filed before the March 15, 2011 hearing, Father was on notice of Mother's request that the court

eliminate, severely limit, supervise, or modify Father's parenting time with the children due to Father's efforts at parental alienation. The trial court pointed out that after the court denied Father's motion in March, Father agreed to ask Dr. Bernet to conduct further evaluations and recommendations. The court rejected Father's arguments that he was misled regarding the extent of the relief Mother was seeking and/or that Dr. Bernet had formed any opinion as to his ultimate conclusion before conducting his evaluations in March, April, and May 2011.

The trial court stated the following:

> By March 15, 2011, the turmoil being experienced by the children was clearly evident to the Court as a result of numerous proceedings between January 12, 2010, and March 15, 2011. Further, a Scheduling Order had been entered and the trial of the case was set to begin on May 25, 2011. The Court believed on March 15, 2011, and continues to believe, that injecting another forensic expert into the lives of the children would have been of no benefit to the Court and would have been harmful to the children. As an alternative, the parties voluntarily agreed and sought the services of Dr. William Bernet who previously had conducted parenting evaluations of Dr. and Ms. Duke in September and October 2007. Further, Dr. Bernet, by agreement of the parties in January 2008, continued his earlier evaluations and assessed the three children, making recommendations regarding the parenting time schedule which was completed in March 2008. Dr. Bernet then testified in April 2009 in connection with the divorce proceedings. As a result of these prior involvements, Dr. Bernet had extensive knowledge of Dr. and Ms. Duke and their children. In addition, the Court's Order of April 6, 2011, afforded Dr. Bernet unlimited contact with the children's court-appointed counselor, Dr. Jay Woodman, which accorded Dr. Bernet access to substantial information regarding the parties' children. The Court then heard testimony from Dr. Bernet during the trial of these post-divorce proceedings. In addition, the Court heard testimony from each of the parties' children. Dr. Duke now disagrees with the opinion of the expert he agreed to consult and seeks to begin anew with a different Rule 26 expert. Applying the standard contained in the Court's Order of March 27, 2011, the Court finds there was no "necessity" for additional expert testimony in connection with these proceedings.

In declining to grant Father's request, the trial court made clear that its rulings as set forth in its Memorandum and Order were not based solely on Dr. Bernet's testimony. The trial court stated that its rulings were also based on the testimony of Mother, Father, the children, Dr. Woodman, and the other evidence introduced during the trial of the case.

## C. Trial Court's Supplemental Memorandum and Order

The trial court issued a Supplemental Memorandum and Order dated December 13, 2012, to address issues of contempt that were presented during the post-divorce trial but that were not addressed in the Memorandum and Order. Mother wanted to convert the temporary restraining order the court entered against Father in January 2010 into a permanent injunction. The restraining order enjoined Father from: (1) discussing divorce or post-divorce matters with the children; (2) approaching Mother's vehicle during exchanges of the children; and (3) communicating with Mother except by e-mail concerning matters relating to logistics in compliance with the Parenting Plan Order or other issues necessary for the parties to address.

The trial court determined that its January 2010 Restraining Order, as modified on February 6, 2010, should be made a permanent injunction for the following reason:

> The prohibition against Dr. Duke's approaching Ms. Duke's vehicle during exchanges was the result of Dr. Duke's misconduct on an occasion when Ms. Duke went to pick up the children at the end of Dr. Duke's parenting time. Dr. Duke went to the driver's side window of Ms. Duke's vehicle and made inappropriate statements to Ms. Duke in the presence of one or more of the children. Further, Dr. Duke has demonstrated since the entry of the Court's findings on June 29, 2009, that he has absolutely no restraint in his communications with Ms. Duke. Dr. Duke says whatever he deems appropriate, whether in the presence of the children or outside the presence of the children. Dr. Duke's inappropriate communications have been both verbal and written. The entry of the restraining order in January 2010, as modified on February 6, 2010, did not prevent Dr. Duke from engaging in further inappropriate written communications with Ms. Duke. The Court has every reason to believe that if the Restraining Order is dissolved and not made a permanent injunction as a result of these proceedings, Dr. Duke's communications with Ms. Duke will continue to be inappropriate in nature.

The trial court found that Father was in civil contempt of court for failing to pay certain of the children's school, medical, and extracurricular activities fees. As a result of the civil contempt finding, the trial court ordered Father to pay Mother $10,693.21 with interest at the maximum statutory rate.

The trial court also found Father guilty of six counts of criminal contempt. The findings of contempt were based on Father's communications to Mother or to the children that were made in violation of the restraining orders or the statute prohibiting him from

23

making unwarranted derogatory remarks about Mother to the children.  One count of contempt was based on Father's refusal to provide Mother with a written itinerary at a time when Father traveled with the children outside the state for more than 48 hours.

Mother asked the trial court to require Father to serve 96 hours in jail as punishment. The trial court declined Mother's request.  Instead, the court sentenced Father to ten days for each count of contempt relating to improper communications and five days of incarceration for refusing to provide Mother with the itinerary.  The court suspended all but two days of each sentence, which were to be served on weekends for six consecutive weeks.

## D.  Trial Court's Final Supplemental Memorandum and Order

In its Final Supplemental Memorandum and Order dated January 25, 2013, the trial court considered Mother's request for an award of her attorneys' fees and costs incurred in the post-divorce proceedings.  Mother sought to recover discretionary costs, including fees for expert testimony, and $611,137.30 in attorneys' fees.  The court awarded Mother the full amount of her attorneys' fees, and $67,795.75 in discretionary costs.  The basis for awarding Mother her attorneys' fees was Tennessee Code Annotated section 36-5-103(c) (2010), which authorizes the award of attorneys' fees incurred in connection with the adjudication of child support, alimony, or the custody or change of custody of any child.  The trial court relied on Tennessee Rule of Civil Procedure 54.04(2) for its award of discretionary costs.

## III. Issues on Appeal

On appeal, Father raises several issues.  Father contends the trial court erred by: (1) modifying the parenting time schedule to limit his time with the children to four hours of supervised visitation every other weekend; (2) terminating Father's communication with the children except during his supervised parenting time; (3) denying Father's request to retain a Rule 26 expert to rebut Dr. Bernet's assertion of parental alienation by Father; (4) excluding portions of Dr. Hunt's testimony; (5) requiring the children to continue counseling with Dr. Woodman; (6) terminating Father's participation in educational decision-making for the children; (7) instituting a permanent injunction against Father; (8) finding Father guilty of six counts of criminal contempt; (9) finding Father guilty of civil contempt; (10) refusing to reopen the proof to allow Father to present evidence of the new Tennessee Board of Medical Examiners Policy Statement regarding opioid medications; (11) refusing to reopen the proof to allow Father to introduce testimony to counter the testimony offered by Dr. Bernet; and (12) awarding Mother $678,933.05 in attorneys' fees and discretionary costs. Mother appeals no part of the trial court's judgments.  However, she argues Father's appeal is frivolous and seeks an award of her attorneys' fees incurred on appeal.

24

Our review of the trial court's findings of fact is de novo upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013); *Rigsby v. Edmonds*, 395 S.W.3d 728, 734 (Tenn. Ct. App. 2012). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692; *Rigsby*, 395 S.W.3d at 734.

## A. Modification of Parenting Schedule

Father initially sought to change the primary residential parenting designation for the parties' eldest child, Wesley, from Mother to Father, and to modify the parenting plan with regard to the two younger children, Emily and Caroline, to provide Father with equal parenting time with his daughters. Mother, who was the primary residential parent, sought to modify the residential parenting schedule by reducing Father's time with the children due to Father's efforts to alienate the children from her. The trial court denied Father's requests, but it granted Mother's request by limiting Father's time with the children to four hours of supervised visitation every two weeks. Father does not appeal the court's judgment insofar as Wesley is concerned because Wesley has reached the age of majority. Father claims, however, that the trial court erred by reducing his parenting time with his daughters to four hours of supervised visitation every two weeks. We conclude the record supports the trial court's determination that Father's interference with Mother's relationship with the children was a material change of circumstance and that limiting Father's parenting time is in the children's best interest.

Modification of a court's prior order with regard to a residential parenting schedule is governed by statute:

If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

25

Tenn. Code Ann. § 36-6-101(a)(2)(C) (2010).

A trial court's determinations of whether a material change of circumstances has occurred and where the best interest of a child lie are questions of fact. *Armbrister*, 414 S.W.3d at 692-93; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Appellate courts must, therefore, "presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Armbrister*, 414 S.W.3d at 693. In weighing the preponderance of the evidence, the trial court's findings of fact that are based on witness credibility are given great weight, and they will not be overturned absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

## 1. Material Change of Circumstances

A petition to modify a residential parenting schedule requires the court to conduct a two-step analysis. The threshold question is whether a material, or significant, change in circumstances has occurred since the entry of the prior parenting schedule. *Boyer v. Heimermann*, 238 S.W.3d 249, 255-59 (Tenn. Ct. App. 2007). Only if the court finds a material change in circumstances does it proceed to consider whether modifying the schedule is in the child's best interest. *Id*. at 259-60.

The party seeking modification of a parenting plan has the burden of proving a material change in circumstances. *Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008); *Kesterson v. Varner*, 172 S.W.3d 556, 567 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has explained that there are no hard and fast rules in determining whether such a material change in circumstances has occurred:

Although there are no bright-line rules for determining when such a change has occurred, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003) (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002)); *see Boyer*, 238 S.W.3d at 255-257 (discussing evolution of the standard for finding a material change in circumstances); *see also Armbrister*, 414 S.W.3d at 701-04 (discussing difference required to prove material change in circumstances for modification of custody versus modification in parenting schedule).

The trial court found there was a material change of circumstances. Specifically, the court found a "deterioration in the relationship between Ms. Duke and the children brought about by Dr. Duke's misconduct."

Father admits that, following the divorce, he told the children the following: (1) Mother may have been involved in the death of his current wife's dog; (2) photographs Mother gave to the children were used by Mother as exhibits during the divorce trial; (3) Mother testified during a deposition that the children had lied; (4) Mother and one of Father's former employees tried to take over Father's business; (5) Mother did not earn her valedictorian medal; (6) Mother secured a $300 loan from their church on the same day that she purchased liquor from a store; and (7) Mother lied in court.

In addition, Dr. Bernet, who was selected as an expert by both Mother and Father to assist the court, testified and prepared a report containing recommendations for a parenting schedule after interviewing both Mother and Father. Father does not contest the facts upon which Dr. Bernet based his recommendation. Rather, Father contends that Dr. Bernet's recommendation of supervised and severely limited parenting time was unjustified. In addition, Father disagrees with Dr. Bernet's conclusion that Father is responsible for what Dr. Bernet refers to as parental alienation and contends Dr. Bernet was biased against him.

Dr. Bernet testified at the trial that he interviewed the children during the divorce proceedings. Prior to the parties' divorce, Dr. Bernet stated that the children had affection for both Mother and Father. Since the divorce, however, Dr. Bernet asserted that the children had "gravitated to having an alliance with their dad, and they seemed to agree with their dad over almost anything, and they seemed to criticize their mom over almost anything."

Dr. Bernet testified that Father persistently, actively, and purposefully undermined and sabotaged the children's relationship with their mother. Father also told Dr. Bernet that he intentionally violated the court order restraining him from talking to the children about the divorce. According to Dr. Bernet, Father's reason for violating the court order was that there are some things in life that are more important than following a court order. Dr. Bernet believed Father considered it important for the children to know what Father perceives as the truth, even if that means jeopardizing the children's relationship with Mother.

As noted above, our review of the record convinces us that the evidence presented at trial does not preponderate against the trial court's finding that there has been a material change in circumstances caused by Father's misconduct since the parties' divorce in 2009. We therefore proceed to the second step of the analysis.

## 2. Children's Best Interest

Once the threshold question is answered with a finding that a material change in circumstances has occurred, the trial court must determine the child's best interest. Tenn. Code Ann. §§ 36-6-401(a), -101(a)(2)(C) (2010); *Armbrister*, 414 S.W.3d at 705. In determining a child's best interest, courts must consider a non-exclusive list of factors found at Tennessee Code Annotated section 36-6-106(a), unless certain limiting factors are "dispositive of the child[ren]'s residential schedule." Tenn. Code Ann. §§ 36-6-404(b), -405(a) (2010). Some of the limiting factors recognize the adverse effect a parent's involvement or conduct may have on a child's best interest, such as the presence of the following conditions:

> (1) A parent's neglect or substantial nonperformance of parenting responsibilities;
>
> . . . .
>
> (3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;
>
> . . . .
>
> (5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development . . . .

Tenn. Code Ann. § 36-6-406(d).

In effect, the trial court determined that the limiting factors were dispositive of the children's residential schedule. First, the court found Father had neglected or substantially failed to perform his parenting responsibilities. This finding was based, in part, on Father's failure to encourage a close and continuing parent-child relationship between the children and Mother, as required by Tennessee Code Annotated sections 36-6-404(b) and 36-6-106(a)(10) (2010). *See* Tenn. Code Ann. § 36-6-401(a) ("relationship between the child and each parent should be fostered unless inconsistent with the child's best interests"); *In re Zamorah B.*, No. M2011-00864-COA-R3-JV, 2013 WL 614449, at *6 (Tenn. Ct. App. Feb. 15, 2013) (explaining that the willingness of one parent to facilitate and encourage child's relationship with other parent is important factor for court to consider).

The trial court next determined that limiting factor (3) applied due to Father's continued addiction to prescription medications. We address this factor in more detail in our

discussion below of the trial court's evidentiary rulings. Consequently, for purposes of the children's best interests, we do not consider whether, at the time of trial, Father was in recovery from his addiction.

Finally, the court found limiting factor (5) applied "because Dr. Duke has clearly used conflict with Ms. Duke to create the danger or damage to the children's psychological development." The court found factor (5) to be of paramount importance: "[T]he standard set forth in factor (5) goes to the very heart of these proceedings inasmuch as the evidence clearly establishes that the psychological development of all of the children has been damaged by virtue of Dr. Duke's misconduct." As a result of these findings, the trial court limited Father's parenting time with the children to four hours of supervised visitation every other weekend. *See Thomas v. Thomas*, No. M2011-00906-COA-R3-CV, 2013 WL 1225849, at *4 (Tenn. Ct. App. March 26, 2013) (concluding circumstances listed in Tennessee Code Annotated section 36-6-406(d) (2010) justify imposing limit on parenting time); *Port v. Hatton*, No. M2011-01580-COA-R3-CV, 2013 WL 865549, at *9 (Tenn. Ct. App. Mar. 6, 2013) (stating Tennessee Code Annotated section 36-6-406(d) provides statutory justification for restricting parent's visitation).

Father admits he made mistakes by involving the children in the litigation and in making statements to the children that disparaged Mother. He contends, however, that he has apologized to the children for things that he has said and done and that the trial court has not taken this into consideration in imposing such a draconian parenting schedule. Father further claims that the trial court did not adequately consider Mother's own conduct in the deterioration of her relationship with the children. Father also points out that the children have indicated they would like more time with Father and have asked to split their time equally between Mother and Father.

The trial court acknowledged the children's request for more time with Father but concluded their request was based on Father's influence. The trial court found Dr. Bernet's and Dr. Woodman's testimony was credible and Father's testimony was not credible. According to Dr. Bernet, Father has significantly damaged Mother's relationship with Emily and Caroline. Dr. Bernet opined that, unless the court took action to address that harm, the consequences to the girls may be severe and long lasting. Dr. Bernet testified further that, without intervention by the court, "the children's disinterest in their mother will get stronger."

In response to a question from Mother's attorney about the effects on the children if the court allows the current parenting plan to continue, Dr. Woodman testified:

If everything were to stay the same, then I would expect that the children would get progressively worse, their relationship with the mother would be impaired. It would be impaired significantly. And that likely would be impaired into adulthood as well because the beliefs about a person drive what it is we really think about them, and the children have some beliefs now that are not necessarily fixed at this point, but they are substantial and they do make an impact on what they do or what the children conclude about their mother. And so to not do anything is to ensure that the course that is currently going on would probably continue . . . . [T]o have an impaired relationship into adulthood usually doesn't bode well for other adjustment issues. You increase all sorts of other clinical issues with people when they have impaired relationships with their parents that include increased likelihood of drug abuse, increased likelihood of depression, and increased likelihood of impaired social relationships for themselves.

Even absent a finding that the Father was impaired, based upon the testimony offered at trial, along with Dr. Bernet's report, we conclude that the evidence does not preponderate against the trial court's finding that it is in the children's best interest that their time with Father be limited as set forth in the trial court's order.

## B. Other Modifications to Parenting Plan

Decisions concerning the details of parenting plans require a fact-intensive inquiry and "consideration of numerous factors." *See, e.g.*, *Armbrister*, 414 S.W.3d at 693. Where a factual inquiry must be performed, "trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges." *Id.* Accordingly, trial judges are granted "broad discretion" to determine the details of a parenting plan, and their decisions "should not be reversed absent an abuse of [that] discretion." *Id*. "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011) (citing *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)).

The appellate court's function is not "to tweak [a parenting plan] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). Although there might be other acceptable alternatives, absent error:

[T]he trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution.

*Id*. at 88.

## 1.  Father's Communications with Children

The trial court limited Father's communication with the children to the four hours of Father's supervised visitation every other weekend, except during counseling sessions with Dr. Woodman.  The court found these additional restrictions were necessary because "[O]therwise Dr. Duke can render the supervised parenting time required by the terms of [the Court's] Order meaningless, and would not afford the children sufficient respite from Dr. Duke and incentive to work to repair their relationship with Ms. Duke."

Father contends this type of limited communication is unprecedented and should not be imposed in this case.  However, definite evidence that visitation places a child in physical or moral jeopardy may justify limiting, or even eliminating, a noncustodial parent's visitation. *Eldridge*, 42 S.W.3d at 85 (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)).  Limitations on parental visitation are no less appropriate where the jeopardy to the child is psychological.  In light of the evidence at trial that ongoing contact with Father poses a threat of substantial psychological harm to the children and based on the discretion the trial court enjoys in fashioning parenting plans, we find that the trial court did not abuse its discretion in limiting Father's communication with the children.

## 2.  Continued Counseling with Dr. Woodman

Father assigns error to the trial court's decision not to discontinue the children's counseling sessions with Dr. Jay Woodman.  As Father points out, each child testified that he or she would like for the counseling sessions to cease.

In its Memorandum and Order, the trial court explained the basis for its denial of Father's request that the children's counseling sessions with Dr. Woodman cease:

> The Court finds that Dr. Duke has undermined the therapeutic relationship between Dr. Woodman and the children.  As one, but very

important, example, the Court would note that during the 120-day period when family therapy was supposed to progress, Dr. Duke openly defied Dr. Woodman and refused to occupy a seat on the same side of the table as Ms. Duke in Dr. Woodman's office where counseling was to occur. Dr. Duke moved to the end of the table and refused to return. This obstinacy occurred in the presence of the children and the session was terminated. Further, Dr. Duke made a unilateral decision that he would no longer participate in family therapy for a period of time and did not return for several weeks in the summer of 2011. As noted herein, all of the children are greatly influenced by their father and take their cues from his behavior. When they observed Dr. Duke acting with the sort of arrogance he displayed with Dr. Woodman, it would only be natural for the children to believe that such conduct is appropriate.

We are hesitant to second-guess the trial court's decision that the children should continue the counseling sessions with Dr. Woodman. Dr. Woodman testified he has been providing counseling to the children since about February 2009. As a result, Dr. Woodman is very familiar with the children and the issues they have been dealing with since before the parties' divorce. In light of the trial court's finding that Dr. Woodman was credible and that the children have been highly influenced by Father, we conclude that Father has failed to show that the trial court abused its discretion in determining that the children's counseling sessions should continue.

**3. Educational Decision Making**

Father next contends the trial court erred when it modified the parenting plan by naming Mother as the sole decision-maker with regard to the children's education. Before the trial court's modification, Mother and Father had joint decision-making authority over the children's educational matters. During the post-divorce proceedings, Mother alleged that she could not co-parent with Father and asked the court to award her sole authority to make educational decisions for the children. The trial court agreed and stated:

Dr. Duke [has] actively undermined the children's confidence in Ms. Duke to promote their academic interest. He suggested to the children that Ms. Duke cheated in order to receive her valedictorian medal. Because of this, both Wesley and Emily question their ability to compete in the rigorous academic environment of Montgomery Bell Academy, after Wesley received admission, and Harpeth Hall School at the time Emily was considering her application for admission. On March 4, 2011, Ms. Duke sent a written communication to Dr. Duke that Harpeth Hall needed a response by March 9

regarding Emily's application. Ensworth had offered Emily placement and Harpeth Hall was willing to put Emily on the waiting list. Ms. Duke asked Dr. Duke if he had an opinion as to what would be the most helpful for Emily. Instead of responding to Ms. Duke, Dr. Duke corresponded directly with Ensworth School and advised their placement officer that Emily would not accept their offer of placement for the eighth grade class. He also contacted Harpeth Hall and advised their placement officer that Emily wanted to remain on the waiting list. Dr. Duke acted unilaterally.

Dr. Duke argues for continuation of the existing parenting plan arrangement affording him joint decision making authority with Ms. Duke for education decisions. Yet, the one occasion when the parties were called upon to communicate effectively and make a joint decision regarding their daughter, Emily's school attendance, Dr. Duke completely usurped that role . . . .

Given the tenor of the written communications from Dr. Duke to Ms. Duke, and the conduct that Dr. Duke has displayed with respect to the parties' children and their relationship with Ms. Duke, the Court finds that it is not in the children's best interest for the parties to continue to exercise joint decision making authority with respect to the children's education decisions. Accordingly, the Permanent Parenting Plan Order incorporated into the Decree entered on July 15, 2009 shall be, and is hereby, amended to reflect that Ms. Duke shall have sole decision making authority with respect to educational decisions regarding the parties' children.

Father cites Tennessee Code Annotated section 36-6-407(c) (2010) as a guideline for the court to follow in allocating decision-making authority. This section directs the court to consider the limitations under Tennessee Code Annotated section 36-6-406, as well as whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the children, when deciding which parent should make decisions for the children. Tenn. Code Ann. §§ 36-6-407(c)(1), (3).

As discussed above, the trial court found that Father neglected or failed to perform his parenting responsibilities and that he had used conflict in an abusive manner to potentially damage his children's psychological development. *See* Tenn. Code Ann. §§ 36-6-406(d)(1), (5) (stating court may limit provisions of parenting plan if identified factors are found to exist). Our review of the record reveals that the evidence does not preponderate against these findings. In addition, the record and evidence reveals that the parties do not cooperate with one another and are seemingly unable to communicate other than by e-mail. Based on the criteria set forth in Tennessee Code Annotated section 36-6-407(c), we conclude the trial

court did not abuse its discretion when it granted Mother sole educational decision-making authority for the children.

### C. Evidentiary Rulings on Expert Testimony

Evidentiary rulings fall "within the trial court's discretion." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999). This Court has stated the following:

> The discretionary nature of the decision does not shield it completely from appellate review but does result in subjecting it to less rigorous appellate scrutiny. Because, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen.

*Id*. at 222-23 (citations omitted). "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Tenn. R. Evid. 103(a); *see also* Tenn. R. App. P. 36(b). Even assuming the admission or exclusion of evidence was error and that the error involved a substantial right, such error will not require reversal of a judgment unless the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *see White*, 21 S.W.3d at 223.

### 1. Denial of Father's Request for an Independent Expert

Father and Mother both executed an Agreed Order for Evaluation and Recommendation in April 2011 that the trial court adopted and entered as an order. Pursuant to the terms of the Agreed Order, Dr. Bernet was to meet individually with Mother and Father to update the parenting evaluations he conducted during divorce proceedings in the fall of 2007, and to make recommendations for parenting time with the children going forward. Despite Father's agreement to use Dr. Bernet, Father contends on appeal that Dr. Bernet was biased in his recommendation. Father argues Dr. Bernet did not reveal his "alignment" with Mother and his support of her request to eliminate Father's parenting time until May 2011, when Dr. Bernet prepared his report.

Father further contends the trial court erred in refusing to allow him to retain another expert to interview the children in an effort to rebut Dr. Bernet's report and recommendations, which Father alleges is biased. Father argues the trial court's denial of his request "completely foreclosed any ability for Mr. Duke to present countervailing proof in order to undermine the testimony of Dr. Bernet and challenge Ms. Duke's allegations that

the children were at risk of emotional endangerment if parenting time with Mr. Duke continued."

A litigant's claim of bias must be based on "facts, not speculation or innuendo." *Runyon v. Runyon*, No. W2013-02651-COA-T10B, 2014 WL 1285729, at *9 (Tenn. Ct. App. Mar. 31, 2014); *see Eldridge v. Eldridge*, 137 S.W.3d 1, 7 (Tenn. Ct. App. 2002) (stating that a litigant contending a judge is biased against her must present evidence indicating impartiality "might reasonably be questioned"); *see also* Tenn. R. Evid. 616 (providing that a party may offer evidence of witness bias through cross-examination and/or extrinsic evidence). Father does not explain the basis for Dr. Bernet's alleged bias, and Father failed to present evidence at trial placing Dr. Bernet's impartiality in question. Father was provided with Dr. Bernet's report prior to trial, and he had an opportunity at trial to cross-examine Dr. Bernet and/or present evidence of Dr. Bernet's alleged bias against Father. We are not persuaded by Father's suggestion, without more, that bias is indicated by Dr. Bernet's communications with Mother's counsel prior to the execution of the Agreed Order for Evaluation and Recommendation or by the number of hours Mother's attorneys may have spent interviewing Dr. Bernet in preparation for trial.

Father makes much of Mother's request in her fourth amended petition for contempt that Father's parenting time with the children be eliminated based on a clear danger to the children. As the trial court pointed out, Father was on notice of Mother's extreme request for relief when he voluntarily entered into the Agreed Order the following month. Father does not allege he was coerced into agreeing to use Dr. Bernet as the parties' expert for the purpose of recommending a parenting schedule. The Tennessee Supreme Court has noted that agreed orders are favored by the courts because they indicate an amicable result to an issue in litigation. Agreed orders have been described as "about the most binding of agreements that can be made." *Lovlace v. Copley*, 418 S.W.3d 1, 30 (Tenn. 2013) (quotations omitted).

In these circumstances, we also see no error in the court limiting the parties to a single, shared expert. The trial court has the discretion to limit the number of expert witnesses permitted to testify. *See Gotwald v. Gotwald*, 768 S.W.2d 689, 700 (Tenn. Ct. App. 1988) (Franks, J., concurring) (stating trial court has broad discretion to limit each side's expert witnesses as to a particular issue); *see, e.g.*, *Conlee v. Taylor*, 285 S.W. 35, 39 (Tenn. 1926) (discussing trial court's power to limit the number of expert witnesses and permit offers of proof); *Powers v. McKenzie*, 16 S.W. 559, 562 (Tenn. 1891) (stating that a judgment will not be reversed because a trial judge limited the number of expert witnesses on a particular question unless it appears that the trial court abused its discretion). In denying Father's request, the trial court explained that the children had gone through so much already that it was unwilling to put them through additional questioning by a new expert. Where it

is acting in a child's best interest, which is the paramount concern, we decline to find the trial court abused its discretion by limiting the parties to a single, shared expert. *See Gotwald*, 768 S.W.2d at 701 (Franks, J., concurring) (stating trial court should enter protective order to protect child's best interest to avoid subjecting child to repetitive evaluations and examinations and should consider court-ordered evaluation to avoid multiple evaluations by "hired guns").

## 2. Exclusion of Portions of Dr. Hunt's Testimony

Father offered Dr. Robert Hunt, his treating psychiatrist, as a witness to testify regarding Father's ADD, his prescribed medications, and his recovery from drug addiction. In particular, Father expected the testimony to prove that he was properly medicated for ADD and was not abusing his prescribed medications. The trial court permitted Dr. Hunt to testify about his treatment of Father for ADD and the medications he prescribed to treat the condition. Dr. Hunt was also permitted to respond to Dr. Bernet's opinion that Father's ADD medication dosage was high. However, the trial court precluded Father from soliciting testimony from Dr. Hunt about whether Father was abusing his medication because that issue was litigated during the 2009 divorce case and the trial court was "not going to retry that question."

Following the trial court's evidentiary ruling, Father's attorney made an offer of proof in which Dr. Hunt testified regarding Father's ADD treatment and drug abuse recovery. Dr. Hunt stated that he has treated Father for ADD from 2000 to 2001 and from 2009 to present. Father was prescribed Vyvanse to treat his ADD during the day and Trazadone to help him sleep at night. Vyvanse is similar to Adderall, but Dr. Hunt stated that Vyvanse has longer lasting effects for Father. Dr. Hunt testified that Father has demonstrated an excellent response to the prescribed medication. He found Father to be more focused, consistent, and more likely to complete routine tasks. It was Dr. Hunt's expert opinion that Father was no longer addicted to opiates and was not currently addicted to Vyvanse or Adderall. Dr. Hunt concluded that, while Father believes he is dependent on Vyvanse to deal with his ADD, Father does not feel powerless to stop using the medication and his life does not revolve around drug use. Finally, Dr. Hunt stated that Father's prescription medication, even in long-acting forms, is not a substitute for opiate drugs because the drugs' binding processes are different. Dr. Hunt opined that adults with ADD do not experience a buzz or high from Adderall or Vyvanse. Instead, they experience calmness and the ability to focus.

Father argues that the trial court's exclusion of Dr. Hunt's testimony was prejudicial because Mother was permitted to present evidence through Dr. Bernet that Father was not in recovery, which the court relied upon to severely limit Father's parenting time. The trial court found that Father was an active drug addict in the 2009 divorce proceedings. In the

post-divorce proceedings, the trial court stated, "[t]he evidence in these [ ] proceedings established that there's been no change in these circumstances since the divorce . . . . [Father] has done nothing to address his addiction as would seem reasonable to this Court if [Father] genuinely desires more time with his children . . . ."

We agree that the trial court's exclusion of Dr. Hunt's testimony relative to Father's treatment for ADD and use of medications was error. The trial court apparently based its evidentiary ruling excluding Dr. Hunt's testimony on res judicata. "A valid custody order or residential placement schedule, once entered by the court, is *res judicata* as to the facts in existence or reasonably foreseeable when the decision was made." *Birdwell v. Harris*, No. M2006-01919-COA-R3-JV, 2007 WL 4523119, at *3 (Tenn. Ct. App. Dec. 20, 2007) (citing *Keisling v. Keisling*, 196 S.W.3d 703, 719 (Tenn. Ct. App. 2005); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999)). This Court has previously stated that Father's recovery from addiction should be considered in determining whether there has been a material change in circumstances justifying a modification of the residential parenting schedule. *Duke v. Duke*, No. M2009-02401-COA-R3-CV, 2012 WL 1971144, at *4 (Tenn. Ct. App. June 1, 2012). Whether Father is an active addict or in recovery is also a factor that might be taken into consideration in determining an appropriate residential parenting schedule. *See* Tenn. Code Ann. § 36-6-406(d)(3). Although res judicata bars reconsideration of whether Father was a drug addict at the time of the divorce, it would not bar evidence showing that Father is a recovering addict. Therefore, Father should have been permitted to offer Dr. Hunt's testimony as evidence that he is not an active addict.

Although the trial court erred in limiting Dr. Hunt's testimony, we conclude that the error was harmless for two reasons. First, the offered testimony of Dr. Hunt did not address the ultimate basis upon which Dr. Bernet recommended limiting Father's parenting time – Father's willful interference with Mother's relationship with the children. Second, the trial court relied on three different factors identified in Tennessee Code Annotated section 36-6-406(d) to limit Father's time with the children. Even if the trial court's reliance on factor (3), which concerns a parent's impairment, was misplaced, two other factors amply support the trial court's decision to limit Father's time with the children. Dr. Hunt's testimony included in the offer of proof did not address either factor (1), Father's substantial nonperformance of parenting responsibilities, or factor (5), Father's "abusive use of conflict" that endangers the children's psychological development. *See* Tenn. Code Ann. § 36-6-406(d).

### D. Permanent Injunction against Father

In its Supplemental Memorandum and Order, the trial court converted a temporary restraining order into a permanent injunction. The restraining order enjoined Father from:

[D]iscussing with the children any of the divorce or post-divorce litigation issues between the parties or issues raised in the pleadings concerning statements by the children; from telling the children, or allowing anyone else to tell the children, that Mother has filed this action or any of the contents of this action; and from showing the children any documents from the divorce trial or subsequent litigation between the parties, including any of the contents of this Petition for Criminal Contempt and for Other Relief, pending further orders of this Court.

In addition, the restraining order enjoined Father from exiting his home or approaching Mother's vehicle during exchanges of the children, and reinstated an earlier restraining order enjoining Father from exiting his vehicle during exchanges at Mother's home, pending further orders of the court. Finally, the restraining order enjoined Father from communicating directly with Mother. This portion of the restraining order was later modified to permit Father to have limited e-mail communications with Mother about compliance with the parenting plan or other issues necessary for the parties to discuss. The injunction was explicit that Father was not to include any commentary in his e-mails; he was to limit the messages to factual information necessary to be communicated.

Tennessee Rule of Civil Procedure 65.07 provides, in relevant part:

In domestic relations cases, restraining orders or injunctions may be issued upon such terms and conditions and remain in force for such time as shall seem just and proper to the judge to whom application therefor is made, and the provisions of this rule shall be followed only insofar as deemed appropriate by such judge.

Trial courts enjoy "wide discretion" when issuing restraining orders in domestic relations cases. *Price v. Price*, No. E1999-00102-COA-R10-CV, 2000 WL 704596, at *8 (Tenn. Ct. App. May 31, 2000); *see also Wilson v. Wilson*, 987 S.W.2d 555, 565 (Tenn. Ct. App. 1998) (stating procedural safeguards set forth in Rule 65 may be ignored in domestic relations cases if trial court deems it "just and proper"). Thus, to prevail, Father must show that the trial court abused its discretion in issuing the permanent injunctions against him.

First, Father contends the injunction preventing him from discussing issues concerning the divorce or post-divorce proceedings with the children is not specific enough to withstand scrutiny and that the evidence was insufficient to support the injunction. We disagree. The injunction is clear that Father is not to talk about the parties' divorce with his children; he is not to talk about the proceedings following the divorce; he is not to direct anyone else to talk about these matters with the children; and he is not to show the children any documents from

the divorce or post-divorce proceedings. Contrary to Father's assertion, we find that the language of this injunction is clear and that it describes in reasonable detail the conduct from which Father is enjoined. Moreover, we find Mother introduced evidence sufficient to support the injunction. Documentary and testimonial evidence was introduced that the children's relationship with Mother was negatively impacted, at least in part, as a result of Father's discussion of the divorce and post-divorce litigation with the children.

Second, Father contends the evidence was insufficient to support the injunction preventing him from exiting his vehicle or house during exchanges of the children.[7] The trial court found, however, that at one point following the parties' divorce, Father approached Mother's vehicle during an exchange of the children and made inappropriate comments to Mother in the presence of one or more of the children. Father does not deny that he engaged in this conduct, and we find the record supports this finding by the trial court. Accordingly, we affirm this portion of the permanent injunction.

Finally, Father contends the limitation on his e-mail communications with Mother will deny him the opportunity to stay informed of the children's health, school, and extracurricular activities. We find this assertion contrary to the terms of the injunction. As the trial court wrote in its Supplemental Memorandum and Order, "the exchange of information between the parties pursuant to the statutory mandates contained in the Permanent Parenting Plan Order is factual in nature and is not impaired by the limitations imposed as a result of the provisions of the Temporary Restraining Order, except that the communications must be by email, text, or in some other written form as opposed to verbal in nature." The Permanent Parenting Plan Order specifically provides that, in accordance with Tennessee Code Annotated section 36-6-101, both parents are entitled to "[t]he right to receive notice and relevant information as soon as practicable but within twenty-four (24) hours of any event of hospitalization, major illness or death of the children." In addition, the parenting plan provides both parents "[t]he right to be given at least forty-eight (48) hours notice, whenever possible, of all extra-curricular activities, and the opportunity to participate or observe them." Activities to which the notice requirement extends include "school activities, athletic activities, church activities and other activities where parental participation or observation would be appropriate."

---

[7] In its Supplemental Memorandum and Order, the trial court modified the parenting plan by directing Father to provide all transportation of the children when exercising his parenting time. Thus, the portion of the injunction precluding Father from approaching Mother's vehicle or exiting his house during exchanges of the children has been rendered moot. Now Father is simply enjoined from exiting his vehicle when he collects the children from or drops the children off at Mother's house.

Father also argues the evidence was insufficient to support the court's limitation on his e-mail communication with Mother. As Mother points out, however, the record is replete with examples of derogatory, insulting, and argumentative e-mails Father sent to Mother regarding her parenting of the children. We conclude the trial court did not abuse its discretion when it entered a permanent injunction against Father limiting Father's e-mails to Mother to factual information only, with no commentary.

### E. Contempt

Tennessee Code Annotated section 29-9-102(3) (2010) provides courts with the power to "issue attachments, and inflict punishments for contempts of court" for "[t]he willful disobedience or resistance of any officer of such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts."

A court's finding of contempt may be either civil or criminal in nature. This Court has previously explained the difference between the two forms of contempt:

> Civil contempt is intended to benefit a litigant while criminal contempt is punishment for an offense against the authority of the court. Civil contempt is imposed to compel compliance with an order, and parties in contempt may purge themselves by compliance. Criminal contempt, on the other hand, is punishment for failing to comply with an order, and the contemptuous party cannot be freed by eventual compliance.

*Sherrod v. Wix*, 849 S.W.2d 780, 786 n.4 (Tenn. Ct. App. 1992) (citations omitted). "Civil contempt occurs when a person does not comply with a court order and an action is brought by a private party to enforce rights under the order that has been violated." *Doe v. Bd. of Prof'l Responsibility of Sup. Ct. of Tenn.*, 104 S.W.3d 465, 473 (Tenn. 2003). "Punishment for civil contempt is designed to coerce compliance with the court's order and is imposed at the insistence and for the benefit of the private party who has suffered a violation of rights." *Id.* Criminal contempt, on the other hand, is intended "to preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society." *Id.* at 474 (quoting *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996)). "Punishment for criminal contempt is both punitive and unconditional in nature and serves to adjudicate 'an issue between the public and the accused.'" *Id.* (quoting *Black*, 938 S.W.2d at 398). This Court has previously stated the following with regard to criminal contempt:

> In a criminal contempt case, the guilt of the accused must be established beyond a reasonable doubt. *Black v. Blount*, 938

40

S.W.2d 394 at 398 (citing *Robinson v. Air Draulics Eng'g Co.*, 377 S.W.2d 908, 912 (Tenn. 1964)). However, on appeal, individuals convicted of criminal contempt lose their presumption of innocence and must overcome the presumption of guilt. "Appellate courts do not review the evidence in a light favorable to the accused and will reverse criminal contempt convictions only when the evidence is insufficient to support the trier-of-fact's finding of contempt beyond a reasonable doubt." *Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993) (citing Tenn. R. App. P. 13(e)). Furthermore, appellate courts review a trial court's decision of whether to impose contempt sanctions using the more relaxed abuse of discretion standard of review. *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993).

*Moody v. Hutchison*, 159 S.W.3d 15, 25 (Tenn. Ct. App. 2004) (quoting *Barber v. Chapman*, No. M2003-00378-COA-R3-CV, 2004 WL 343799, at *2 (Tenn. Ct. App. Feb. 23, 2004)).

A finding of either civil or criminal contempt requires four elements: (1) the order allegedly violated was lawful; (2) the order was clear and unambiguous; (3) the individual charged did in fact violate the order; and (4) the individual acted willfully in so violating the order. *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008); *Furlong v. Furlong*, 370 S.W.3d 329, 336 (Tenn. Ct. App. 2011) (stating that the four-element analysis outlined in *Konvalinka* applies to criminal and civil contempt actions). Father does not challenge the lawfulness of the orders at issue in the criminal contempt charges, nor is it disputed that Father actually violated the orders.

In the context of civil contempt, conduct is willful if it "is the product of free will rather than coercion . . . if [the person] is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Konvalinka*, 249 S.W.3d at 357 (citing *State ex rel. Flowers v. Tenn. Trucking Ass'n Self. Ins. Group Trust*, 209 S.W.3d 602, 612 (Tenn. Ct. App. 2006)).

However, in the context of criminal contempt, willfulness has two elements: (1) intentional conduct; and (2) a culpable state of mind. *See State v. Beeler*, 387 S.W.3d 511, 523 (Tenn. 2012); *Konvalinka*, 249 S.W.3d at 357. Willful disobedience of any court order "entails an *intentional* violation of a known duty . . . ." *Beeler*, 387 S.W.3d at 523 (emphasis in original) (citing *In re Sneed*, 302 S.W.3d 825, 826 n.1 (Tenn. 2010)). The statutory definition of intentional conduct is found in Tennessee Code Annotated section 39-11-302(a) (2010): "'Intentional' refers to a person who acts intentionally with respect to the nature of

41

the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). To satisfy the culpable state of mind requirement, the act must be "undertaken for a bad purpose." *Konvalinka*, 249 S.W.3d at 357. In other words, willful disobedience in the criminal contempt context is conduct "done voluntarily and intentionally and with the specific intent to do something the law forbids." *Id*. (quoting *State v. Braden*, 867 S.W.2d 750, 761 (Tenn. Crim. App. 1993) (upholding this definition of willful misconduct for criminal contempt)).

### 1. Criminal Contempt

The trial court found Father guilty, beyond a reasonable doubt, of six different counts of criminal contempt. Father does not contest the lawfulness or clarity of the orders at issue, and we find the orders to be lawful and unambiguous. Father also does not contest that he actually violated the orders. Rather, Father claims he either did not act "willfully" or he satisfied his statutory obligations. We disagree.

The first count of criminal contempt was based on a statement Father made to the children following the parties' divorce that Mother, or someone working for her, was responsible for the death of a dog that belonged to Father's then-girlfriend. Father admitted that he made this statement to the children. When Father made the statement, he was subject to the provisions of Tennessee Code Annotated section 36-6-101(a)(3)(A)(vi), which prohibited him from making unwarranted derogatory remarks about Mother to the children.

Father claims his statement was not a violation of Tennessee Code Annotated section 36-6-101(a)(3)(A)(vi) because the statements were not "unwarranted" within the meaning of the statute. Father points to a comment that Mother made in counseling as support for his statement that Mother was responsible for the dog's death. Regardless of the factual support the comment provides, the statement was "unwarranted" because of its predictable negative impact on the children. The record reflects that the statement severely influenced the children's view of Mother. Father also argues his statement was not "willful" because he did not make it with intent to violate the statute and he immediately regretted making the statement. However, Father acted willfully in that his conduct was intentional and done with intent to violate the statute. Father decided to make the statement with knowledge that such a derogatory comment would violate the court's orders and his statutory obligations. Father does not claim that he was unaware of his obligation to refrain from making derogatory remarks about Mother in the children's presence. Although Father may have regretted the statement after making it, this does not diminish the fact that Father consciously and voluntarily made the statement.

The next four counts of criminal contempt were based on e-mails and text messages from Father to Mother, following the parties' divorce, that were disparaging of Mother's parenting style and criticized specific parenting decisions she had made. When Father sent these e-mails and texts to Mother, he was subject to the restraining order entered in February 2010 that limited Father's communications with Mother as follows:

> The Father may communicate by email with the Mother . . . but such communication shall be factual concerning logistics or compliance under the Parenting Plan or such other issues that the parents must address, and it shall contain no commentary by either party outside of the factual information that needs to be exchanged.

Father admitted sending each of the texts and e-mail messages at issue. He claims, however, that the court erred in finding him in criminal contempt because his actions were not willful. Father argues that his actions do not qualify as willful because they were not undertaken for a bad purpose; rather, Father claims he acted out of concern for his children's safety and well-being.

Father's texts and e-mails meet both prongs of the standard for willfulness in the context of criminal contempt. First, Father's acts were intentional, not inadvert or accidental. Second, Father acted with a culpable state of mind. The requirement that actions be undertaken for a "bad purpose" does not foreclose the possibility of a well-intentioned or caring motive. *See Thigpen v. Thigpen*, 874 S.W.2d 51, 54 (Tenn. Ct. App. 1993) (finding criminal contempt even though Mother was "following her maternal desire to help her son avoid a disturbing situation."). The "bad purpose" requirement addresses the actor's mens rea – their intent to act as the law forbids. While Father claims that he sent the texts and e-mails out of concern for his children's welfare, the record demonstrates that he was also aware that his acts would violate the trial court's directives.

The final count of criminal contempt was based on Father's failure to provide Mother with a written itinerary of his travel plans with the children in December 2009 when Father took the children on a trip to Colorado. The parties' Permanent Parenting Plan Order requires either parent who plans to take the children outside of Tennessee for more than 48 hours to provide the other parent with a written itinerary, which is to include telephone numbers, flight information, and lodging information, for use in an emergency. Father provided Mother with the departing flight information. However, he did not provide Mother with lodging information, and he did not share the children's return flight information with Mother until after Father and the children had left Tennessee. Father asserts that he did not provide Mother with the lodging information because he believed Mother could obtain this

information from the children; thus, he believed he had satisfied his obligations under the parenting plan.

The trial court found Father was required to provide Mother with the itinerary, that Father was aware of this obligation, and that, despite repeated requests from Mother for this information, Father willfully failed and refused to provide it. As a result, the court found Father in criminal contempt for failing to comply with the court's order, as set forth in the parenting plan.

Father's failure to provide Mother with a written itinerary was willful because he chose not to provide a timely itinerary with knowledge that he was required to do so by the parenting plan. Father does not allege he was unaware of the terms of the parenting plan and the record demonstrates his familiarity with it. Accordingly, we conclude the trial court did not abuse its discretion in finding Father guilty of six counts of criminal contempt and affirm the trial court's judgment in this regard.

## 2. Civil Contempt

The trial court also found Father guilty of one count of civil contempt for failing to pay some of the children's school, medical, extracurricular, and summer camp expenses. Father agrees that the order was lawful, he actually violated the order, and his conduct was willful. Father also stipulated that he had the ability to pay any obligations imposed upon him by the court. However, Father argues that the order was ambiguous. Determining whether an order is sufficiently clear and unambiguous is a question of law subject to de novo review. *Konvalinka*, 249 S.W.3d at 356 (citations omitted).

The provision in question is found in "The Findings of Fact and Conclusions of Law for Grounds for Divorce and Permanent Parenting Plan," which was incorporated by reference in the Final Decree of Divorce. The provision requires Father to pay certain non-school related expenses incurred on behalf of the children:

> Husband shall continue to be responsible for any additional non-school associated extracurricular activities' expense (including summer camps, baseball, dance and gymnastics) not to exceed $500 per month per child. Whenever possible, Husband shall pay these expenses directly to the school or supplier or Husband shall reimburse Wife within 30 days of receipt of the bill from Wife. These obligations will terminate with each child as he or she reaches the age of 18 or graduates from high school, whichever occurs last.

44

Father took the position at trial that he was not required to pay any amount for extracurricular activities or summer camp until shortly before the activity or summer camp was to take place and that he was required to pay no more than $500 towards that activity or summer camp.

Father testified that he would "not release funds for camps until 30 days prior to when the child is supposed to be going to camp." According to Father, even if the cost of a camp or activity exceeds $500, he is required to pay no more than $500 for that activity or camp. Father explained his interpretation to the court as follows:

> Q: Let's use the camps as an example. What was the issue with the camps?
>
> A: Well, if it's a $2,000 camp, it's my understanding, since that all occurs in a single month, that I'm responsible for up to $500 of whatever the extracurricular activity for that month for the child is.
>
> . . . .
>
> The Court: [I]f [Mother] sends you a bill for $2,000 in March of 2011 for a camp to attend in June of 2011, your position is you would only pay $500 of the $2000?
>
> Father: $500 would be for June for that child for extracurriculars.
>
> The Court: So your interpretation is it's the month in which it's incurred, not the cost of the activity?
>
> Father: Yes, sir.

Mother, on the other hand, argued the provision at issue requires Father to pay up to $6,000 per child, per year for extracurricular activities, without regard for the date(s) when the cost is incurred or the activity takes place. The court adopted Mother's interpretation of the parenting plan:

> Ms. Duke contends that Dr. Duke should be found in civil contempt of court for failure to pay school, medical and extracurricular activities and that he should be imprisoned until he purges himself of contempt.

45

Dr. Duke argues that the Court's order requiring him to make these payments is ambiguous . . . and for this reason he cannot be held in contempt.

. . . .

The Court finds that Dr. Duke's obligation to pay or reimburse Ms. Duke for the cost of the children's school, medical and extracurricular activities is sufficiently clear that Dr. Duke should be found in civil contempt of court. Based upon this finding and the terms of the foregoing stipulation embodied in the August 26, 2010 Order, Dr. Duke shall, within 10 days from and after entry of this Order, pay Ms. Duke the sum of $10,693.21, together with interest thereon at the maximum statutory rate from and after December 27, 2011. In the event Dr. Duke fails to comply with this Order and make payment as required, he shall be taken into custody and remain incarcerated in the Williamson County Jail until he purges himself of contempt by complying with the requirements of this order.

"Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of civil contempt." *Konvalinka*, 249 S.W.3d at 356 (citations omitted). Although orders need not be immune from *all* vagueness challenges, they must "leave no reasonable basis for doubt regarding their meaning." *Id*. (citations omitted). Furthermore, any ambiguities in an order alleged to have been violated are interpreted in favor of the party facing the contempt charge. *Id*. (citations omitted).

We find the provision of the Final Decree of Divorce relative to extracurricular activities is susceptible to more than one reasonable interpretation. Orders should be construed objectively by considering the language of the order, the circumstances surrounding the issuance of the order, and the order's intended audience. *Id*. (citations omitted). The language "not to exceed $500 per month" can be read either as setting a limit on Father's responsibility for payment or a limit on the rate at which expenses for extracurricular activities can be incurred. If read as limit on Father's responsibility for payment, the provision could be interpreted to mean that Father would not be obligated to pay or reimburse Mother for any expense beyond the first $500, or the provision could limit the rate at which Father would be required to pay or reimburse Mother for the expense, irrespective of the total amount of the expense. We do not perceive the circumstances surrounding the issuance of the order, a hotly contested divorce, or the order's intended audience as clarifying the meaning.

46

Because there is a reasonable basis for doubt regarding the provision's meaning, the provision cannot support a finding of civil contempt. *See Konvalinka*, 249 S.W.3d at 356. In so finding, we do not disturb the court's interpretation of its order or the portion of the judgment awarding Mother $10,693.21 for extracurricular expenses plus post-judgment interest. In awarding a judgment on Mother's claim for reimbursement, the court interpreted its order as requiring Father to pay or reimburse Mother for extracurricular expenses, irrespective of the total amount of the expense. The court further interpreted the order as permitting Father to make his payment for such expense monthly, at a rate not to exceed $500 per month. Generally, trial courts are "in the best position to interpret and construe its own orders, even when a trial judge has no independent memory of the proceedings in a cause of action." *Sharp v. Stevenson*, No. W2009-00096-COA-R3-CV, 2010 WL 786006, at *5 (Tenn. Ct. App. Mar. 10, 2010) (citing *Richardson v. Richardson*, 969 S.W.2d 931, 935 (Tenn. Ct. App. 1997)).

## F. Reopening the Proof

Appellate courts review a trial court's decision regarding the reopening of proof after a trial is concluded using an abuse of discretion standard. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 149 (Tenn. 1991) (citing *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985); *Higgins v. Steide*, 335 S.W.2d 533, 535 (Tenn. 1959)). Father is required to show he suffered an injustice as a result of the trial court's denial of his motion to prove the trial court abused its discretion. *Id.* at 149 (citing *Higgins*, 335 S.W.2d at 535).

The trial of this case was concluded on March 8, 2012. Following the close of evidence, Father moved to reopen the proof based on two different grounds. He first filed a motion on June 29, 2012, in which he sought to reopen the proof to introduce a policy statement regarding opioid addiction that the Tennessee Board of Medical Examiners adopted following the conclusion of the trial. Father wanted to introduce the policy statement to prove he was in recovery and receiving appropriate treatment for his previous addiction to hydrocodone. Father sought to refute Mother's argument that Father was simply substituting his ADD medication (Vyvanse) for the hydrocodone to which he was formerly addicted.

Father then filed an amended motion on July 13 after receiving Mother's attorneys' fee affidavit. Father alleged the fee affidavit proved that Dr. Bernet was not acting in a neutral capacity when he wrote his report, which was introduced as an exhibit at trial, and when he testified during the trial. Father asked the trial court to strike Dr. Bernet's testimony and allow Father to retain his own expert to interview the children and present additional evidence to the court.

The trial court denied both parts of Father's motion, as amended. The court first explained that it is the law of the case that Father is an addict:

At the trial of these post-divorce proceedings, the evidence established that Dr. Duke is now taking Vyvanse, a form of Adderall, at approximately twice the recommended dosage for an adult. In addition, Dr. Duke takes prescription medication in the evening to enable him to sleep. Dr. Duke's addiction is relevant to the issue of whether there has been a substantial change of circumstances which warrants modification of the Permanent Parenting Plan Order entered on July 15, 2009. During the course of these post-divorce proceedings, the Court received testimony from various medical experts, none of whom opined that there has been any change in Dr. Duke's addiction since the divorce trial in April and May 2009. . . . The Policy Statement is in the nature of another expert opinion, of which the Court has already received many, on the subject of Dr. Duke's addiction . . . . At the trial of these post-divorce proceedings, Dr. Duke acknowledged to this Court that he is chemically dependent on Vyvanse. Accordingly, the March 27, 2012 Policy Statement of the Tennessee Board of Medical Examiners on Office Based Treatment of Opioid Addictions does not constitute a sufficient basis to reopen the proof in this case.

The trial court then turned to Father's argument regarding Dr. Bernet's testimony:

Dr. Duke's analysis of Ms. Duke's attorneys' time records to show the extent of the contact between Dr. William Bernet and Ms. Duke's attorney, without more, is insufficient to support a conclusion that Dr. William Bernet was biased, that his testimony should be stricken, or that Dr. Duke should be allowed to employ an independent expert to interview the children and reopen the proof to hear testimony from such expert. Dr. Duke was given full opportunity, prior to and during trial, to inquire of Dr. Bernet as to the nature and extent of all contact that Dr. Bernet had with Ms. Duke and/or her attorney. There has been no showing, whatsoever, that Dr. William Bernet failed to make himself available to Dr. Duke and/or his counsel to the same extent that he was available to Ms. Duke and/or her counsel. Further, the parties agreed, as evidenced by an Agreed Order entered on April 6, 2011, that Dr. Bernet would update parenting evaluations he conducted in September and October 2007, prior to the trial of these post-divorce proceedings. There is absolutely no indication that Dr. Bernet withheld any information from Dr. Duke and/or his counsel or misrepresented any information to Dr. Duke

48

and/or his counsel, which would invalidate Dr. Duke's agreement to engage Dr. Bernet's services for the purpose of these post-divorce proceedings. "Extensive communication" between counsel for Ms. Duke and Dr. Bernet without more is an insufficient basis for the Court to reopen the proof in this case.

We first address the trial court's decision not to reopen the proof to admit the policy statement about opioid addiction. As we explained above in our review of the trial court's limitation of Dr. Hunt's testimony regarding Father's addiction, the issue of Father's recovery from addiction was not the only or most important factor in the court's decision to limit Father's parenting time. Even if Father were able to show he is a recovering addict, this fact would not affect the trial court's finding that Father willfully undermined and interfered with Mother's relationship with the children. Father's misconduct is what led to the court's severe limitation and supervision of Father's parenting time. For this reason, we conclude no injustice resulted from the trial court's refusal to reopen the proof to admit the policy statement regarding opioid addiction. Accordingly, we find no error in the trial court's decision not to consider the policy statement after the close of proof.

We also find the fee affidavit submitted by Mother's attorneys an insufficient basis to reopen the proof. As the trial court noted, Mother's attorneys' time records alone are insufficient evidence of bias on the part of Dr. Bernet. Father had an opportunity to question Dr. Bernet during the trial to reveal any bias Dr. Bernet may have had against Father in favor of Mother. Father has not pointed us to any such questioning, and we have not found any suggestion of bias by Dr. Bernet against Father upon our review of the transcripts.

Dr. Bernet testified that he was asked separately, by both Mother's attorney and Father's attorney, to prepare a parent re-evaluation for this case. Although Father claims he was unaware of "extensive communications" between counsel for Ms. Duke and Dr. Bernet prior to the entry of the Agreed Order for Evaluation and Recommendation, we decline to read into those communications any bias on the part of Dr. Bernet. Moreover, the trial court explicitly stated that its ultimate determination regarding Father's parenting time was not based solely upon Dr. Bernet's report and testimony. Rather, the court relied upon the testimony of Father, Mother, the children, Dr. Woodman, and all of the other evidence presented during the trial. The court wrote, "Dr. Bernet's opinion was only one factor aiding the Court in reaching its decision."

## G. Attorneys' Fees and Discretionary Costs

Father's final argument on appeal is that the trial court erred in awarding Mother her attorneys' fees and discretionary costs in the amount of $678,933.05. On the issue of attorneys' fees, Father contends that a majority of the attorneys' time was devoted to the criminal contempt charges Mother filed against Father and that such time is not eligible for an award of fees. Father makes the same argument with respect to discretionary costs but adds that the trial court also improperly awarded expert fees related to trial preparation.

The trial court awarded Mother her attorneys' fees pursuant to Tennessee Code Annotated section 36-5-103(c) (2010).[8] In support of its award to Mother of these fees, the trial court wrote:

> While there were many collateral issues addressed in these proceedings, the primary thrust of these post-divorce proceedings involved Ms. Duke's efforts to modify the Permanent Parenting Plan Order to severely limit Dr. Duke's contact with the parties' children and Dr. Duke's efforts to modify the Permanent Parenting Plan Order by naming him the primary residential parent of the parties' children, by affording no parenting time for Ms. Duke with Wesley, except as Wesley desires, and by sharing equal parenting time with the parties' daughters. Ms. Duke has presented a forceful case to the Court establishing misconduct by Dr. Duke which has resulted in extreme harm to the parties' children. The vast majority of the evidence introduced by Ms. Duke concerning Dr. Duke's alleged criminal contempt behavior was relevant on the issue of modification of the Permanent Parenting Plan Order. All of the expert testimony presented by Ms. Duke, with the exception of Mr. Kurt Myers, was relevant on the issue of modification of the Permanent Parenting Plan Order.

---

[8] Tennessee Code Annotated section 36-5-103(c) provides:

The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

. . . .

In applying the factors set forth in RPC 1.5 of Rule 8 of the Supreme
Court Rules, the Court finds that these divorce proceedings presented novel
and difficult questions relating to the effect on the parties' children of their
father's misconduct. Rarely does a Court confront parenting issues
comparable to those presented in this litigation.

Father does not dispute the trial court's finding that the evidence Mother relied on to
support her petitions for contempt was relevant to her request that the Permanent Parenting
Plan Order be modified to reduce Father's parenting time. Father also does not contend he
did not have a fair opportunity to cross-examine Mother's witnesses or present his own
evidence.[9] Moreover, the record does not include a transcript or statement of the evidence
from the hearing on Mother's motion for an award of fees and costs.[10] Our Supreme Court
has stated the following:

Our ability to review the evidentiary record de novo is hampered when the
record on appeal contains neither a transcript nor a statement of the evidence
of the trial. Thus, when an issue of sufficiency of the evidence is raised on
appeal, we must presume, in the absence of a record of the proceedings, that
the transcript or statement of the evidence, had it been included in the record,
would have contained sufficient evidence to support the trial court's factual
conclusions. *Kincaid v. Bradshaw*, 65 Tenn. 102, 103 (1873); *Sherrod v. Wix*,
849 S.W.2d 780, 783 (Tenn. Ct. App. 1992).

*Fayne v. Vincent*, 301 S.W.3d 162, 169-70 (Tenn. 2009).

---

[9] In fact, the trial court found "Dr. Duke offered no evidence at the hearing on December 18, 2012,
to rebut the testimony of Ms. Duke's counsel or either expert witness testifying on her behalf, concerning
the reasonableness of the fees."

[10] According to the trial court's Final Supplemental Memorandum and Order, the parties were unable
to reach agreement on any issue, and every issue was contested. The court noted that evidence was presented
during the hearing that the hourly rates charged by Mother's attorneys were reasonable and the time
expended was necessary.

The trial court awarded Mother her discretionary costs pursuant to Tennessee Rule of Civil Procedure 54.04(2).[11]  The costs the trial court awarded Mother included court reporter fees in addition to fees for the testimony by several expert witnesses.  With regard to its award of these costs, the court explained:

> Ms. Duke is the prevailing party in these proceedings.  The discretionary costs requested by Ms. Duke are authorized by Tenn. R. Civ. P. 54.04(2) and they are necessary and reasonable.  Further, the Court finds that Ms. Duke has not engaged in conduct during litigation which would justify depriving her of the costs requested.

As Father points out, Rule 54.04(2) does not allow prevailing parties to recover expert witness fees for preparing for depositions or trial, even if those fees are reasonable and necessary. *Miles v. Marshall C. Voss Health Care Ctr.*, 896 S.W.2d 773, 775-76 (Tenn. 1995).  However, the prevailing party may recover expert witness fees for actual deposition or trial testimony and for fees associated with having an expert available to testify. *Stalsworth v. Grummons*, 36 S.W.3d 832, 836 (Tenn. Ct. App. 2000) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 917 (Tenn. 1999)).

The trial court was careful to award only those fees attributable to the experts' time spent testifying at trial, not time spent preparing for trial.  The trial court explicitly stated that it lacked authority to award discretionary costs for fees incurred by Mother to pay for her experts' preparation of their trial testimony, and fees incurred by Mother to pay for her experts' presence at the trial to hear other witnesses' testimony.  Father fails to direct us to anything in the record suggesting the court awarded discretionary costs for anything other than court reporter fees, which Father does not contest, and expert witness testimony.

---

[11] Tenn. R. Civ. P. 54.04(2) provides, in relevant part:

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees not paid pursuant to Tennessee Supreme Court Rule 42, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

In sum, Father has failed to show that the trial court abused its discretion in awarding attorneys' fees and discretionary costs. We, therefore, affirm the trial court's judgment awarding Mother these fees and costs.

## H. Attorneys' Fees on Appeal

Mother seeks an award of fees she incurred on appeal on two different grounds. First, Mother requests that we award her fees pursuant to Tennessee Code Annotated section 36-5-103(c). Secondly, Mother asserts Father's appeal is frivolous, and she seeks an award of her attorneys' fees as damages pursuant to Tennessee Code Annotated section 27-1-122 (2010).[12]

We first address whether Father's appeal is frivolous. The statute authorizing an award of damages for frivolous appeal "must be interpreted and applied strictly so as not to discourage legitimate appeals." *See Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977) (citing the predecessor to Tennessee Code Annotated section 27-1-122). A frivolous appeal is one "utterly devoid of merit." *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978). We do not find this appeal devoid of merit or any indication that it was undertaken for delay. Therefore, we decline to award Mother her appellate fees on this basis.

Mother's alternative ground for seeking an award of her fees on appeal is Tennessee Code Annotated section 36-5-103(c), the same statute under which the trial court awarded attorneys' fees to Mother. Pursuant to this statute, appellate courts have discretion to award a prevailing party fees incurred on appeal. *Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008); *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004). In exercising our discretion, "we should consider, among other factors, the ability of the requesting party to pay his or her own attorney's fees, the requesting party's success on appeal, and whether the requesting party has been acting in good faith." *Shofner*, 181 S.W.3d at 719.

Considering the above factors, we grant Mother's request for attorneys' fees on appeal. Mother has been successful on the great majority of the issues presented by Father,

---

[12] Tenn. Code Ann. § 27-1-122 provides:

When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

and the trial court made specific note of Mother's economic inability to engage in the protracted litigation this dispute has engendered.  Accordingly, we remand this case to the trial court for a determination of the appropriate amount of attorneys' fees to which Mother is entitled.

## IV.  CONCLUSION

For the reasons set forth above, we reverse the trial court's finding of civil contempt against Father but affirm the trial court's judgments in all other respects.  The matter is remanded for further proceedings consistent with this opinion.  Costs of this appeal shall be taxed to the appellant, Harold W. Duke, III.

_____
W. NEAL McBRAYER, JUDGE